STATE OF CONNECTICUT *v.* RANDY W. WILLIAMS
(13023)

PETERS, C. J., HEALEY, SHEA, SANTANIELLO and JACOBSON, Js.

Argued February 10—decision released April 14, 1987

*Kenneth Rosenthal,* assistant public defender, and *Richard Emanuel,* with whom, on the brief, was *Donald D. Dakers,* public defender, for the appellant (defendant).

*Robert J. Devlin, Jr.,* assistant state's attorney, with whom, on the brief, was *Arnold Markle,* state's attorney, for the appellee (state).

PETERS, C. J. The principal issue on this criminal appeal is the defendant's claim that the trial court failed to secure his knowing and intelligent waiver of the right to be represented by an attorney free from conflicts of interest. The defendant, Randy Williams, was charged by substitute information with the crimes of robbery in the first degree, in violation of General Statutes § 53a-134 (a) (3),[1] and burglary in the first degree, in violation of General Statutes § 53a-101 (a) (1).[2] After

[1] "[General Statutes] Sec. 53a-134. ROBBERY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime: (1) Causes serious physical injury to any person who is not a participant in the crime; or (2) is armed with a deadly weapon; or (3) uses or threatens the use of a dangerous instrument; or (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm; except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged. Nothing contained in this subdivision shall constitute a defense to a prosecution for, or preclude a conviction of, robbery in the second degree, robbery in the third degree or any other crime."

[2] "[General Statutes] Sec. 53a-101. BURGLARY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and: (1) He is armed with explosives or a deadly weapon or dan-

a trial to a jury, he was found guilty on both counts and sentenced to two concurrent sentences of twenty years, execution suspended after ten years. The defendant appeals from this judgment of conviction. We find no error.

The jury could reasonably have found the following facts. At the time of the incident, the victim, a thirty-one year old woman, was staying as a guest at an apartment on Lake Place in New Haven. Just before 4 p.m. on January 24, 1985, the victim returned to the apartment from food shopping. While she was bringing her groceries into the first floor apartment, she saw a man knocking on the door of the apartment across the hall. The victim told the man that the occupant of the other apartment would not be home from work until 4 p.m. She then went back outside to retrieve her child, whom she had left in a stroller. While bringing the stroller inside the building, she heard a sound from inside the apartment across the hall. She told the man that it sounded as if the occupants were home. She then entered her apartment, pulling the stroller after her. The man followed her inside and closed the door behind him. He displayed a knife and reached around the stroller to grab the victim's pocketbook from a couch. He then ran out of the apartment and into the street.

Following the robbery the victim immediately called the New Haven police. A short time later, when police had arrived at the apartment, she described the robber as a black man, twenty to twenty-five years old, approximately six feet tall, with a thin mustache, a somewhat muscular build, and a mark or scar under the center of his left eye. The victim also told the police that the robber had worn an olive green knit hat, and

gerous instrument, or (2) in the course of committing the offense, he intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone."

that she could discern that he had short hair underneath. After the victim gave her description, the police brought her to the New Haven police station, where she viewed an array of photographs in an attempt to identify the man who had robbed her. The defendant's photograph appeared twice in the array. After viewing both of these photographs, the victim positively identified the defendant as the robber. She also identified the defendant in court.

In his appeal, the defendant claims that the trial court erred in: (1) failing adequately to canvass the defendant before accepting his waiver of the right to be represented by an attorney free from conflicts of interest; (2) denying his motion to suppress the victim's pre-trial and at-trial identifications, along with other motions relating to the identifications; (3) denying his motions relating to the failure of the police to preserve the array from which the victim selected the defendant's photograph, and to preserve their handwritten notes on the victim's description of the defendant; and (4) overruling his objections to allegedly prejudicial testimony by two police detectives. We find no error.

I

The facts underlying the defendant's first claim of error, regarding the validity of his waiver of the right to conflict-free representation, are as follows. On October 9, 1985, at the start of the third day of trial, the defendant's attorney, Kenneth Rosenthal, advised the trial court of a conflict of interest that, he claimed, prohibited him from presenting certain evidence on the defendant's behalf. That evidence, contained in New Haven police department records that the defendant had subpoenaed on the previous day of trial, related to the possibility that a third party who bore a physical resemblance to the defendant had committed the crimes with which the defendant was charged. Both

the defendant and the third party lookalike were represented by the public defender's office. The defendant's attorney claimed that "the rules of ethics" prohibited him from pursuing, on the defendant's behalf, a line of defense that might implicate the third party lookalike.[3]

The defendant's attorney told the trial court that, earlier that day, he had discussed the conflict with his client and had advised him of two possible remedial options: (1) the defense attorney could withdraw from the case, possibly provoking a mistrial; or (2) the defense attorney could continue to represent the defendant, but would not attempt to introduce evidence relating to the

[3] "The Court: Mr. Rosenthal, you indicated you wanted to put something on the record?

"Mr. Rosenthal: Yes, your Honor. At the conclusion of yesterday's proceedings, I had subpoenaed some records from the New Haven Police Department pertaining to an individual, some records that I wished to use to cross-examine, potentially, Detective [Mary] Fish. I should indicate to the Court these records relate in a general way to a potential lookalike in this case. It would have been our claim that that was so; that there was information that came to my attention in a way that was focused last Thursday afternoon, late in the afternoon after court, that our office has a conflict in that the subject of the lookalike is someone that another member of my office represents in this courthouse presently, not on the—Well, I'll leave it at that—And that we would move to withdraw from that other case thinking that that would solve the problem.

"In discussions today, your Honor, and some research as well, I have come to the conclusion that the rules of ethics prohibit me—even if the motion to withdraw in the other case is granted—prohibit me from pursuing this line of defense. And I should indicate to the Court, as I have indicated to my client—I don't mean to waive any other aspects of my communications with my client in this regard—that I feel as a defense attorney in this case, that this piece of evidence is very powerful evidence, would be very powerful evidence either in cross-examination, but perhaps more importantly as a part of the defense. And I cannot—I don't think the rules of ethics would permit me to go into the details as to why that is so. I think there's information on the public record that would bear out what I'm saying. And I have explained that to my client in discussions with him concerning where we stand in the case and particularly where we stand in the case as it bears on what I perceive to be my inability as his lawyer to pursue this item of a powerful defense."

third party lookalike. The defense attorney indicated that the defendant had "preliminarily" chosen the second option. He also told the court that, although his inability to present the lookalike evidence would leave "a hole" in the defendant's case, "the case has been going well and [the defendant] . . . is concerned about concluding the case." The defense attorney said that he was "torn" over how to proceed and requested "a minute to talk with [the defendant] in another room."[4] The court granted this request.

Upon returning from the conference, the defendant's attorney told the court that the defendant wished to proceed with trial. The trial court then addressed the defendant personally, asking him whether his attorney had explained "his problem" with presenting the lookalike evidence, and whether the defendant understood the consequences of not being able to present that evidence at his trial.[5] The defendant replied affirmatively

---

[4] "Mr. Rosenthal: I was just talking with him again, your Honor, in the room after we came out of chambers, to reiterate to him—I should say, your Honor, that this is something that is turning around in my mind. It's something that I had a discussion with an attorney in Bridgeport about less than an hour—approximately an hour ago; and it was that, in particular, that made me realize something that I hadn't realized before; that whatever the other case may mean, I have a problem in this case. It's something, the more I think about it, the more I am concerned about it. Both because I think about losing—how much of a hole it leaves in the case. At the same time I realize—I feel the case has been going well and that Mr. Williams, I know, is concerned about concluding the case. So I am torn, and I don't know that he is at this point. But I'm urging him in a way, and I have urged him in private as well, to think long and hard about giving up this information.

"The Court: Well, and what is the—

"Mr. Rosenthal: Can I confer with him briefly, your Honor?

"The Court: Go ahead.

"Mr. Rosenthal: Can I just have a minute to talk with him in the other room?

"The Court: Go ahead."

[5] "The Court: I want to make sure the record is clear that Mr. Williams wishes to proceed as you've indicated.

"I gather, Mr. Rosenthal, you have spent some time before we opened

to both questions, and indicated that he wanted to proceed with trial nonetheless.

During the colloquy, the defendant asked the trial court, if he were to pursue the lookalike evidence, how much time would elapse if a new trial were ordered and a new attorney appointed to represent him. The defendant's attorney, evidently interpreting this question as an indication that "[the defendant] is still pondering

court here, explaining the situation and the problems you were confronted with, with your client. And you've just done it again for ten minutes or so in the side room while we waited here.

"Is that correct, Mr. Williams? Has Mr. Rosenthal explained what his—what the problem he has with presenting what we call, for the sake of a better word, a lookalike defense? Has he explained it to you?

"The Defendant: Yes, he explained it, your Honor.

"The Court: And you understand that if he—that he feels that if he continued to represent you in this case, that he ethically can't bring up that claim in any respect, can't offer evidence on it, or he can't make it in any way? It's something that the jury will never hear about.

"Do you understand that?

"The Defendant: Yes, I understand.

"The Court: And despite that, your position is you wish him to continue with this trial and not make that claim, is that what you want done?

"The Defendant: Yes.

"The Court: Are you sure you understand this now?

"The Defendant: Yes.

"The Court: Mr. Rosenthal, you are satisfied, based on talking with your client, that he does understand the nature of the problem and exactly what he's doing here?

"Mr. Rosenthal: Yes, your Honor, I am.

"The Court: Well, then we should go ahead.

"The Defendant: Let me ask you something, your Honor. If I didn't, right—

"The Court: If you didn't what?

"The Defendant: Didn't want to proceed with the trial, just wanted to get that piece of evidence in, sort of present it to the jury, how long would it be for me to start trying all over again? Exactly how long would it take for the court to appoint another special public defender?

"The Court: First of all, I don't know that there will be a mistrial. I suspect the State might have some objection to it. How long would it be if the case were tried again if there were a mistrial? I don't have anything to do with that. That is Judge Kinney's responsibility. I cannot tell you. I have no idea.

"The Defendant: Okay."

this decision and may need some legal advice," requested additional time to confer with his client. The court granted this request. Following a brief conference, the defense attorney again told the trial court that the defendant wished to continue with the trial. The trial then proceeded without any reference to the third party lookalike evidence.

The defendant contends that the trial court denied him his state and federal constitutional rights by failing to elicit a knowing and intelligent waiver of his right to conflict-free representation. The defendant claims that he "was apprised of neither the factual context of what he was relinquishing, the legal options available, the tactical implications of his action, nor the substantial risks and pitfalls he was facing." While we recognize the constitutional significance of the right to conflict-free representation, we conclude that, on this record, the trial court did not err in allowing the defendant to proceed with trial notwithstanding his attorney's unwillingness to present the lookalike evidence.

Our state and federal constitutions guarantee a criminal defendant the right to assistance of counsel. U.S. Const., amend. VI; Conn. Const., art. 1, § 8.[6] As an

---

[6] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense."

Article first, § 8, of the Connecticut constitution provides: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel; to be informed of the nature and cause of the accusation; to be confronted by the witnesses against him; to have compulsory process to obtain witnesses in his behalf; to be released on bail upon sufficient security, except in capital offenses, where the proof is evident or the presumption great; and in all prosecutions by indictment or information, to a speedy, public trial by an impartial jury. No person shall be compelled to give evi-

adjunct to this right, a criminal defendant is entitled to be represented by an attorney free from conflicts of interest. *Wood* v. *Georgia,* 450 U.S. 261, 271, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981); *Glasser* v. *United States,* 315 U.S. 60, 70, 62 S. Ct. 457, 86 L. Ed. 680 (1942); *State* v. *Martin,* 201 Conn. 74, 78, 513 A.2d 116 (1986); *Festo* v. *Luckart,* 191 Conn. 622, 626–27, 469 A.2d 1181 (1983). While the right to conflict-free representation typically is implicated in cases involving representation of criminal codefendants by a single attorney; see, e.g., *Holloway* v. *Arkansas,* 435 U.S. 475, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978); G. Lowenthal, "Joint Representation in Criminal Cases: A Critical Appraisal," 64 Va. L. Rev. 939 (1978); it is equally applicable in other cases where a conflict of interest may impair an attorney's ability to represent his client effectively. See *State* v. *Martin,* supra, 80.

Just as the right to assistance of counsel may be waived in favor of self-representation; see *Faretta* v. *California,* 422 U.S. 806, 819, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975); *State* v. *Carter,* 200 Conn. 607, 611, 513 A.2d 47 (1986); so may a defendant waive the right to conflict-free representation. The trial court must, however, determine on the record that such a waiver is knowing and intelligent. *Glasser* v. *United States,* supra, 71; *United States* v. *Curcio,* 680 F.2d 881, 888–89 (2d Cir. 1982); *State* v. *Tyler-Barcomb,* 197 Conn. 666, 670, 500 A.2d 1324 (1985), cert. denied, 475 U.S. 1109, 106 S. Ct. 1518, 89 L. Ed. 2d 916 (1986). "If the defendant reveals that he is aware of and understands the various risks and pitfalls, and that he has the rational capacity to make a decision on the basis

dence against himself, nor be deprived of life, liberty or property without due process of law, nor shall excessive bail be required nor excessive fines imposed. No person shall be held to answer for any crime, punishable by death or life imprisonment, unless on a presentment or an indictment of a grand jury, except in the armed forces, or in the militia when in actual service in time of war or public danger."

of this information, and if he states clearly and une-quivocally . . . that he nevertheless chooses to hazard [the] dangers" of waiving conflict-free representation, then his waiver may appropriately be accepted. *United States* v. *Curcio,* supra; *State* v. *Tyler-Barcomb,* supra. The waiver is not vitiated simply because the defendant, with the benefit of hindsight, might have chosen differently. A defendant "need not be prescient" in order to waive knowingly and intelligently the right to conflict-free representation. *United States* v. *Curcio,* supra.

A trial court has the obligation to inquire into the possibility of a conflict of interest "when it knows or reasonably should know" that a potential conflict exists. *State* v. *Martin,* supra, 79; *State* v. *Rodriquez,* 200 Conn. 685, 695, 513 A.2d 71 (1986); *Festo* v. *Luckart,* supra, 629. In this case, the defense attorney informed the trial court of his conflict,[7] but did not move to withdraw from the case. Cf. *Holloway* v. *Arkansas,* supra; *State* v. *Martin,* supra. Rather, the defense attorney told the court that the defendant was inclined to proceed notwithstanding the conflict, and that, in his opinion, "the case [had] been going well." The trial court thereafter properly queried the defendant personally to determine how he wished to proceed. See *United States* v. *Iorizzo,* 786 F.2d 52, 59 (2d Cir. 1986); *State* v. *Rodriquez,* supra; *Festo* v. *Luckart,* supra.

The defendant claims that the trial court's canvass was deficient because it failed to ascertain whether the defendant was fully aware of the "factual and legal parameters" of his waiver. We disagree. The defend-

---

[7] Solely for purposes of this argument, we will assume that the office of the public defender's joint representation of the defendant and the third party lookalike constituted an actual, rather than potential, conflict. As the state's brief correctly notes, however, "neither the legitimacy of the ethical conflict nor the admissibility of the [lookalike] evidence [was] litigated" at trial.

ant assured the court that he wished to continue with trial while represented by the same attorney, and that he was aware that, because of his attorney's position, he would be unable to avail himself of the lookalike evidence. Moreover, the trial court's knowledge of the precise circumstances of the defense attorney's conflict, and the extent to which these circumstances were communicated to the defendant, was limited by the attorney's invocation of the attorney-client privilege.[8] It would not have been appropriate for the trial court to press for details. "The scope of the trial court's inquiry should . . . not be overly intrusive into the attorney-client relationship." *State* v. *Tyler-Barcomb,* supra.

We note further that the trial court, after eliciting from the defendant that his attorney had explained the nature of the conflict to him, asked the defense attorney whether he was "satisfied" that his client understood "the nature of the problem and exactly what he's doing here." The attorney replied in the affirmative. "[A]ttorneys are officers of the court, and ' "when they address the judge solemnly upon a matter before the court, their declarations are virtually made under oath." ' " *Holloway* v. *Arkansas,* supra, 486, quoting *State* v. *Brazile,* 226 La. 254, 266, 75 So. 2d 856 (1954). The attorney, moreover, had an ethical obligation to disclose to the defendant the circumstances of the conflict and its effect upon his ability to exercise independent professional judgment on the defendant's behalf. Code of Professional Responsibility, DR 5-105 (C)[9]; *In re Lanza,* 65 N.J. 347, 352–53, 322 A.2d 445 (1974);

---

[8] See footnote 3, supra.

[9] "[Code of Professional Responsibility] DR 5-105 REFUSING TO ACCEPT OR CONTINUE EMPLOYMENT IF THE INTERESTS OF ANOTHER CLIENT MAY IMPAIR THE INDEPENDENT PROFESSIONAL JUDGMENT OF THE LAWYER.

"(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment,

*In re Boivin,* 271 Or. 419, 424, 533 P.2d 171 (1975). The trial court could properly rely on the defense attorney's representations, as well as the responses of the defendant, in determining that the defendant was adequately apprised of the risks of his decision. *Kaplan v. United States,* 375 F.2d 895, 897 (9th Cir.), cert. denied, 389 U.S. 839, 88 S. Ct. 67, 19 L. Ed. 2d 103 (1967); *State v. Martin,* supra, 82; J. Geer, "Representation of Multiple Criminal Defendants: Conflicts of Interest and the Professional Responsibilities of the Defense Attorney," 62 Minn. L. Rev. 119, 145 (1978).

The defendant also argues that his waiver was not clear and unambiguous; see *State v. Carter,* supra; because his question to the court, asking how long it would take to obtain new counsel if he "wanted to get [the lookalike evidence] in," suggested that the primary motivation for his decision was to avoid a delay in the proceedings. The defendant further argues

---

or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5-105 (C).

"(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5-105 (C).

"(C) In the situations covered by DR 5-105 (A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each. . . ."

The relevant provision of the Code, without substantive charges, has been reenacted in the Rules of Professional Conduct, which superseded the Code of Professional Responsibility October 1, 1986.

In an affidavit supporting his post-verdict motion for a new trial, the defendant claimed that his attorney had not advised him of the details of the lookalike evidence, except to say that the other suspect's picture resembled him "and that [the lookalike] was also under arrest for robbery." The record, however, does not show that the trial court was made aware of this alleged omission at the time of its canvass of the defendant. To the contrary, both the defendant and his attorney assured the court that the defendant had been sufficiently apprised of the circumstances of the conflict.

that this question shows that "he had some desire" to obtain admission of the lookalike evidence. We are not persuaded, however, that the defendant's question to the court, following his unqualified assurances that he understood the consequences of his actions, raises the spectre of ambiguity. On the contrary, the defendant's question showed that he was aware of the potential value of the lookalike evidence, a further indication that his ultimate decision to forego that evidence was an informed one. The defendant's waiver was not invalidated, moreover, by his evident concern that the appointment of substitute counsel in mid-trial might delay the proceedings. Concern over potential delay, along with a perception of the benefits of continued representation by an attorney who had worked on the case from the start, may properly have weighed in the defendant's decision to proceed with trial. See G. Lowenthal, "Successive Representation by Criminal Lawyers," 93 Yale L.J. 1, 61 and n.266 (1983).

The defendant argues further that the trial court failed to allow him a reasonable time to "digest and contemplate the risks posed" by waiving his right to conflict-free representation. The record does not support this claim. The trial court gave unqualified assent to every defense request for additional time before finally accepting the defendant's decision to proceed with trial. Although the defendant claims on appeal that his attorney did not inform him of the conflict until "minutes" before court convened on October 9, the defendant never requested a continuance for additional time to discuss the matter. In light of the defendant's failure to seek a continuance, we conclude that it was not unreasonable for the trial court to assume that he had had all the time he needed to consider the risks of his decision. See *State* v. *Festo,* 181 Conn. 254, 266, 435 A.2d 38 (1980).

Finally, the defendant contends that the trial court should have elicited narrative responses from him, instead of yes and no answers, to insure that he understood the implications of the conflict of interest and the effect of proceeding to trial with his existing counsel. We agree that such responses, on the record, would have furnished additional assurance that the defendant's waiver was knowing and intelligent. See *United States* v. *Curcio,* supra, 889; *United States* v. *Dolan,* 570 F.2d 1177, 1181 (3d Cir. 1978); *United States* v. *Garcia,* 517 F.2d 272, 278 (5th Cir. 1975). If the record otherwise demonstrates that the defendant made a valid waiver, however, the failure to elicit narrative responses does not, in itself, justify reversal. See *United States* v. *Curcio,* supra. We conclude that the defendant's responses to the trial court's inquiries, coupled with his attorney's representations that he had been fully apprised of the risks of his decision, evinced a knowing and intelligent waiver of the right to conflict-free representation.[10]

## II

The defendant's second claim of error stems from the victim's pre-trial identification of the defendant from a photographic array. The identification occurred at the New Haven police station shortly after the robbery. The victim was asked to examine several ring-bound albums, or "trays," containing photographs of black males. Each tray contained approximately 270 photographs, with each page containing a maximum of four photographs. The victim testified that she had exam-

---

[10] The defendant also argues that the trial court should have encouraged him to seek the advice of independent counsel in making his decision to waive the right to conflict-free representation. See *United States* v. *Iorizzo,* 786 F.2d 52, 59 (2d Cir. 1986); *United States* v. *Cunningham,* 672 F.2d 1064, 1069 (2d Cir. 1982). In view of the defendant's repeated assurances that he understood what he was doing and wished to proceed with trial, however, we conclude that the trial court's failure to point out this option did not invalidate the defendant's waiver.

ined some two and one-half trays when New Haven police Detective Mary Fish handed her another tray and instructed her to look through it. Fish had placed a photograph of the defendant in this tray, which, unknown to Fish, already contained a photograph of the defendant. The victim looked through the tray and, upon viewing one of the defendant's photographs, told Fish that he resembled the man who had robbed her. She told Fish, however, that she was not prepared to make a positive identification. The victim then continued to look through the tray until she saw a second photograph of the defendant. She told Fish that she would make a positive identification only if this photograph was of the same person she had previously indicated as resembling the robber. Fish told the victim that the two photographs were, indeed, of the same person. The victim then signed one of the photographs of the defendant, indicating a positive identification. She later positively identified the defendant in court as the man who had robbed her.

The defendant claims that the admission of the victim's pre-trial and at-trial identifications denied him his constitutional rights to due process of law because: (1) the circumstances of the pre-trial identification were suggestive; and (2) the identification evidence was unreliable because of discrepancies between the victim's description of the robber and the defendant's physical features.[11] We will consider these claims in turn.

In order to suppress evidence of an identification derived from allegedly unconstitutional procedures, a criminal defendant bears the burden of proving that

[11] At trial, the defendant cited the allegedly prejudicial pre-trial identification procedure in support of motions to: (1) dismiss the case; (2) suppress both the pre-trial and at-trial identifications; and (3) bar the state from demonstrating the reliability of the procedure by introducing evidence of the large number of photographs viewed by the victim. The trial court denied all of these motions.

the identification procedures were unnecessarily suggestive, and, if so, that the resulting identification was unreliable in the totality of the circumstances. *State v. Miller,* 202 Conn. 463, 470, 522 A.2d 249 (1987); *State v. Amarillo,* 198 Conn. 285, 291, 503 A.2d 146 (1986); *State v. Perez,* 198 Conn. 68, 73, 502 A.2d 368 (1985); see also *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 199–201, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972). "Only if the procedures used to identify the accused are unnecessarily suggestive are we required to analyze the factors that determine the reliability of an identification for due process purposes." *State v. Miller,* supra; *State v. Amarillo,* supra, 294. An identification procedure is unnecessarily suggestive when it " 'give[s] rise to a very substantial likelihood of irreparable misidentification.' " *State v. Fullwood,* 193 Conn. 238, 243–44, 476 A.2d 550 (1984), quoting *Simmons v. United States,* 390 U.S. 377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968); *State v. Vaughn,* 199 Conn. 557, 563, 508 A.2d 430 (1986).

The defendant argues that the pre-trial photographic identification procedure was unnecessarily suggestive because: (1) the photographic array was not compiled to include lookalikes; (2) his photograph appeared more than once in the array; (3) the victim was aware, at the time she viewed the array, that the police had a suspect in mind; and (4) the victim's attention was directed to the tray in which the defendant's photograph appeared.[12] We conclude, however, that the

---

[12] The defendant faults the identification procedure on two other grounds: first, that the "person administering" the procedure was aware of the defendant's identity as a suspect, and that her "unspoken expectations" were communicated to the victim; and second, that the police confirmed that the two photographs of the defendant selected by the victim depicted the same person. The first of these arguments compares the identification procedure to a testing process, a tenuous analogy. Moreover, the defendant cites no evidence in the record to support his claim that subliminal com-

defendant has failed to sustain his burden of showing that the identification procedure violated his constitutional rights to due process of law.

The defendant's first argument is that the photographic array was suggestive because it was not purposively compiled to include photographs of persons who resembled him. While the inclusion of lookalikes in a photographic array may enhance the reliability of the viewer's identification of a particular photograph, the failure to include lookalikes does not, in itself, render an identification procedure suggestive. The fact that the victim viewed several hundred photographs, all of males of the defendant's race, diminished any possible suggestiveness inherent in the identification procedure employed in this case. See *State* v. *Perez,* supra, 74; *State* v. *Austin,* 195 Conn. 496, 501, 488 A.2d 1250 (1985). We conclude, therefore, that the failure of the array to include lookalikes did not taint the victim's pretrial identification of the defendant.

The defendant next argues that the recurrence of his photograph in one of the trays viewed by the victim rendered the identification procedure suggestive. We recognize that the inclusion of multiple photographs of a suspect in an array may be suggestive, because it increases the risk of misidentification. *State* v. *Miller,* supra, 473; *State* v. *Boucino,* 199 Conn. 207, 219, 506 A.2d 125 (1986); *State* v. *Hinton,* 196 Conn. 289, 292–93, 493 A.2d 836 (1985). Such photographic recurrence, however, is not presumptively suggestive. *State*

munication from the police influenced the victim's selection of photographs. As to the second argument, we fail to discern how Fish's confirmation that the two photographs of the defendant were of the same person could have led to misidentification, since, before the confirmation, the victim had already singled out the photographs as resembling the robber. The fact that she did not make a positive identification until she knew that the selected photographs were of the same person goes to the weight, and not the admissibility, of the identification. See *State* v. *Perez,* 198 Conn. 68, 76, 502 A.2d 368 (1985); *State* v. *Ledbetter,* 185 Conn. 607, 612, 441 A.2d 595 (1981).

v. *Miller,* supra; *State* v. *Boucino,* supra; see also *People* v. *Owens,* 36 Ill. App. 3d 1049, 1055, 344 N.E.2d 525 (1976), cert. denied, 429 U.S. 1108, 97 S. Ct. 1143, 51 L. Ed. 2d 562 (1977); *Commonwealth* v. *Paszko,* 391 Mass. 164, 169–71, 461 N.E.2d 222 (1984); *State* v. *Thompson,* 59 N.J. 396, 414, 283 A.2d 513 (1971). Recurring photographs taint an identification procedure only when, in the context of the entire array, the recurrence unnecessarily emphasizes the defendant's photograph. See *Simmons* v. *United States,* supra, 383; *State* v. *Ledbetter,* 185 Conn. 607, 613, 441 A.2d 595 (1981). The risk of such emphasis increases when the array includes only a small number of photographs in which only one suspect's photograph recurs. See *United States* v. *Mears,* 614 F.2d 1175, 1177 (8th Cir. 1980) (defendant's photograph occurred twice in array of seven photographs); *State* v. *Ledbetter,* supra, 608–609 (defendant's photograph occurred twice in two successive arrays of eight photographs each). In this case, however, the victim viewed several hundred photographs, without making an identification, before examining the tray which contained the defendant's photographs. After preliminarily identifying one photograph of the defendant, the victim testified that she continued looking through the tray for an additional five to ten minutes before she saw the second photograph of the defendant. Under these circumstances, any possible suggestive effect of the recurring photographs was "diffused and attenuated." *State* v. *Austin,* supra. Moreover, in contrast to *Ledbetter,* there is no evidence that the police *intentionally* included the defendant's photograph twice in order to increase the likelihood that the victim would identify him. We conclude, therefore, that the recurrence of the defendant's photograph did not render the identification procedure unnecessarily suggestive.

The defendant makes two additional arguments in support of his claim that the pre-trial identification pro-

cedure violated his due process rights. The defendant argues that because a police comment alerted the victim, before she viewed the photographs, that the police had a suspect in mind, her subsequent identification was tainted.[13] He also argues that Fish's instruction to the victim to examine the tray which contained the defendant's photographs was unnecessarily suggestive. We disagree. Nowhere in the record is there any evidence that the police expressly informed the victim that a suspect's photograph was included in a particular display. Cf. *Sawyer* v. *State,* 260 Ind. 597, 298 N.E.2d 440 (1973); see also *State* v. *Austin,* supra, 500. Even assuming, however, that remarks by the police caused the victim to infer that the suspect's photograph was included in the last tray that she viewed, the procedure was not thereby rendered impermissibly suggestive. When a crime victim is asked to view a display of photographs directly following her description of the perpetrator of the crime, she may reasonably surmise that "the police may consider one of the persons presented . . . [to be] a suspect in the case." *State* v. *Fullwood,* supra, 245; *Towles* v. *United States,* 428 A.2d 836, 845 (D.C. 1981). When, as in this case, the victim "would have inferred [without police comment] that the occasion for [her] being requested to identify someone is that the police have a particular person in mind who has been included among those to be viewed," police statements to that effect do not render the identification procedure unnecessarily suggestive. *State* v. *Austin,* supra. Accordingly, we conclude that the police comments in this case did not taint the pre-trial identification.

Our holding that the victim's pre-trial identification of the defendant was not unnecessarily suggestive

---

[13] The victim testified that, after she had described the robber to the police at her apartment, one of the officers present said that he "had an idea of who may have done it."

makes it unnecessary for us to consider his ancillary claim that the identification evidence was unreliable. See *State* v. *Miller,* supra, 470. We note, however, that the defendant bases his claim of unreliability on alleged discrepancies between the appearance of the robber as described by the victim and the defendant. We have consistently held that a "partial misdescription of the person being identified goes to the weight rather than to the admissiblity of the identification." *State* v. *Perez,* supra, 76, and cases cited therein. "The weaknesses of identifications can be explored on cross-examination and during counsel's final arguments to the jury." *State* v. *Kemp,* 199 Conn. 473, 478, 507 A.2d 1387 (1986).[14]

### III

The defendant next claims that the state and the New Haven police improperly failed to preserve: (1) a record of the array from which the defendant's photographs were selected; and (2) the notes of two police officers who spoke with the victim immediately following the robbery. We will consider these claims separately.

The defendant's principal argument regarding the array is that the failure of the police to make a record of the tray from which his photographs were selected

---

[14] The defendant also claims that the trial court erred in sustaining the state's objection to his attempts to impeach the photographic identification procedure by introducing evidence that similar procedures had resulted in incorrect identifications in other cases. In sustaining the objections, the court indicated a desire to avoid a collateral excursion into extraneous issues. The trial court has a broad discretion in determining the relevancy of evidence. *State* v. *Bunkley,* 202 Conn. 629, 648–49, 522 A.2d 795 (1987); *State* v. *Parker,* 197 Conn. 595, 601, 500 A.2d 551 (1985). In the exercise of this discretion, the court in this case could properly restrict the admission of evidence on collateral issues which might confuse or distract the jury. *State* v. *Johnson,* 190 Conn. 541, 551, 461 A.2d 981 (1983). The defendant, moreover, had an adequate opportunity to point out the alleged inadequacies of the identification procedure in his cross-examination of witnesses and closing argument to the jury.

denied him the opportunity to impeach the reliability of the identification procedure, thus impairing his constitutional rights of confrontation. At trial, the defendant cited the unavailability of such a record in support of motions to suppress the identification evidence, dismiss the case, and for an adverse inference that the identification procedure was unnecessarily suggestive. The court denied all of these motions. The defendant took proper exceptions.

" 'Although the practice [of retention and preservation for examination at trial of the photographs at pretrial identification] is highly desirable, it cannot be held, as a matter of law, to be a necessary condition precedent to a permissible in-court identification.' " *State* v. *Doolittle,* 189 Conn. 183, 199, 455 A.2d 843 (1983), quoting *State* v. *Lally,* 167 Conn. 601, 607, 356 A.2d 897, cert. denied, 423 U.S. 829, 96 S. Ct. 48, 46 L. Ed. 2d 46 (1975); *State* v. *Miles,* 195 Conn. 552, 555, 489 A.2d 373 (1985); *State* v. *McKnight,* 191 Conn. 564, 570–71 n.5, 469 A.2d 397 (1983). The failure to preserve such evidence does not give rise to a constitutional violation "unless the 'omitted evidence,' evaluated on the entire record, creates a reasonable doubt [as to the defendant's guilt] that did not otherwise exist." *State* v. *Doolittle,* supra; *United States* v. *Agurs,* 427 U.S. 97, 112, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976); *State* v. *Amarillo,* supra, 297.

In this case, the defendant had ample opportunity to cross-examine the victim and Detective Fish to expose to the jury the alleged weaknesses of the pre-trial identification procedure. He also made the jury aware that the photographic array had not been preserved. The trial court, moreover, instructed the jury to consider the circumstances of the identification and credibility of the victim in assessing whether the identification was reliable. See *United States* v. *Telfaire,* 469 F.2d 552, 556 (D.C. Cir. 1972); *State* v. *Harrell,* 199 Conn. 255,

270–71, 506 A.2d 1041 (1986). The jury was accordingly free to draw inferences unfavorable to the state based on its failure to preserve a record of the array. It could also consider, however, that the victim had identified the defendant with a high degree of certainty. Against this evidence, we conclude that a record of the array was not of such importance to the defendant's case that it would have created additional reasonable doubt as to his guilt.

The defendant next claims that the failure of two New Haven police officers to preserve their handwritten notes of conversations with the victim deprived him of due process of law and denied him access to materials necessary to the presentation of a defense. Before the commencement of trial, the defendant had moved for the production of "[a]ll reports, notes or other documents" pertaining to the victim's description of the perpetrator. At trial, Officer Jonathan Smith and Detective Fish testified that the victim had given them descriptions of the robber at her apartment immediately following the crime. Smith testified, however, that he had been unable to locate the notes he took regarding the description. Fish testified that she had discarded her notes. Both officers testified that they had incorporated their notes into official police reports of the incident, which had been made available to the defendant. Upon learning that the notes had existed, but could not be produced, the defendant moved: (1) to strike the testimony of the victim and the two officers; (2) for inferences that the defendant was entitled to discovery of the notes and that the notes contained material unfavorable to the state; (3) for judgment of acquittal; and (4) for a new trial. The trial court denied all of these motions, and the defendant properly excepted.

A defendant may, under some circumstances, obtain police officers' records of an interview with a witness for purposes of cross-examiniation. Practice Book

§§ 750, 752[15]; *State* v. *Mullings,* 202 Conn. 1, 7, 519 A.2d 58 (1987); *State* v. *Hinton,* supra, 299. Under Practice Book § 749, however, such disclosure is limited to the "statements" of witnesses. *State* v. *Hinton,* supra, 300; *State* v. *Myers,* 193 Conn. 457, 470, 479 A.2d 199 (1984). Practice Book § 749 offers two alternate definitions of "statement": "(1) A written statement made by a person and signed or otherwise adopted or approved by him; or (2) A stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by a person and recorded contemporaneously with the making of such oral statement." A police officer's notes may be subject to disclosure to the defendant for use in cross-examining the interviewed witness, provided they meet either of § 749's alternate definitions of "statement." They may also be discoverable to cross-examine the police officer if they are "signed or otherwise adopted" by the officer. *State* v. *Hinton,* supra, 299–300; *State* v. *Myers,* supra; *State* v. *Anonymous (83–FG),* 190 Conn. 715, 734, 463 A.2d 533 (1983).

---

[15] "[Practice Book] Sec. 750. ——DISCOVERABLE AS OF RIGHT

"Subject to the provisions of Sec. 784, upon written motion of the defendant the prosecuting authority shall disclose to the defendant and allow the defendant to inspect, copy or photograph any of the following items which are known to him and obtainable by him in the exercise of due diligence:

"(1) Any relevant statements made by the defendant to any law enforcement officer of this state or his agent, or any copies of the same;

"(2) The substance of any oral declarations of the defendant of which a written or other tangible recording has been made and which were made by the defendant, whether before or after arrest, in response to interrogatories by any person then known to the defendant to be a law enforcement officer or his agent or a prosecuting authority or his agent; or

"(3) Any relevant statements of coconspirators which the prosecuting authority intends to offer in evidence at any trial or hearing."

"[Practice Book] Sec. 752. —— ——PRODUCTION FOLLOWING TESTIMONY

"After a witness called by the state has testified on direct examination at trial, the judicial authority shall, on motion of the defendant, order the state to produce any statement of the witness in the possession of the state or its agents, including state and local law enforcement officers, which statement relates to the subject matter about which the witness has testified."

The defendant contends on appeal that Smith's and Fish's notes were statements because they contained "substantially verbatim contemporaneous account[s]" of the victim's description of the robber. The record does not support the claim that the notes were "substantially verbatim" accounts. The victim testified that she was not even aware that the police were taking notes while she was being interviewed at her apartment. If the officers, in the victim's presence, had been taking pains to write down her exact words, it is unlikely that the victim would have been unaware of this. Furthermore, there is nothing on the record to suggest that the victim, or either of the officers, signed or otherwise adopted the notes. See *State* v. *Myers,* supra, 471. Both Fish and Smith testified that they fully incorporated their notes into police reports which were available to the defendant. The notes, therefore, were not "statements" discoverable under the relevant Practice Book provisions. The trial court accordingly did not err in denying the defense motions relating to the state's failure to produce the notes.[16]

## IV

The defendant's final claim is that the trial court erred in overruling his objections to the testimony of two New Haven police detectives, James Ponteau and Melvin Daniels, who were witnesses for the state at his trial. Essentially, the defendant argues that the detectives' testimony was irrelevant and had a prejudicial effect on his case. We will consider the defendant's arguments separately with regard to the testimony of each of the detectives.

---

[16] In his reply brief, the defendant argues that the violation of due process he alleges in this claim exists independently of Practice Book § 749. There is, however, no constitutional right of access to the statements of a prosecution witness. *State* v. *Mullings,* 202 Conn. 1, 8, 519 A.2d 58 (1987); *State* v. *Vessichio,* 197 Conn. 644, 662, 500 A.2d 1311 (1985), cert. denied, 475 U.S. 1122, 106 S. Ct. 1642, 90 L. Ed. 2d 187 (1986).

Ponteau testified, over the defendant's timely objections, on the third and fourth days of the trial, after the jury had heard the testimony of the victim and Detective Fish. His testimony, in summary, was as follows: While on duty on January 24, 1985, he had heard a description of the perpetrator of the Lake Place robbery broadcast over his police radio. He then contacted Fish and told her that the description fit that of "the subject that I know by the name of Randy Williams," and that she should insert the defendant's photograph into the array viewed by the victim. The court allowed the latter testimony over the defendant's hearsay objection. Immediately after the testimony, however, the court admonished the jury that it should not consider Ponteau's testimony as evidence that the defendant matched the police description of the robber, but "only . . . to explain why this officer did what he did upon hearing the description."

The state contends on appeal, as it did at trial, that Ponteau's testimony was relevant to show why the police deliberately inserted a photograph of the defendant into the array, an issue raised by the defendant in his cross-examination of Fish. The defendant argues that whatever relevance the testimony had was outweighed by its prejudicial effect. While the defendant does not state specifically how Ponteau's testimony caused him prejudice, he suggests that the detective's familiarity with the defendant might have indicated to the jury that the defendant had a police record.

Evidence is relevant if it tends to prove or disprove a contested issue in the case. *State* v. *Binet,* 192 Conn. 618, 623, 473 A.2d 1200 (1984); *State* v. *Briggs,* 179 Conn. 328, 332, 426 A.2d 298 (1979), cert. denied, 447 U.S. 912, 100 S. Ct. 3000, 64 L. Ed. 2d 862 (1980). The trial court has broad discretion in determining the relevancy of proffered evidence, and its decision in this regard will be sustained on appeal absent an abuse of

discretion. *State* v. *Bunkley,* 202 Conn. 629, 648–49, 522 A.2d 795 (1987); *State* v. *Braman,* 191 Conn. 670, 676, 469 A.2d 760 (1983); *State* v. *Williams,* 190 Conn. 104, 108, 459 A.2d 510 (1983). In this case, the trial court carefully limited the scope of Ponteau's testimony, in response to defense arguments, to exclude possibly prejudicial evidence of tenuous relevancy. It refused to allow Ponteau to testify that the police department had diligently attempted to locate the defendant after the victim's pre-trial identification. It also prohibited him from testifying that he had seen the defendant walking on the streets in the vicinity of the robbery, because Ponteau had not so observed him for several months before the crime occurred. The trial court's admonition to the jury diminished any possible prejudice that might have resulted from Ponteau's testimony. Nothing in the testimony suggested, moreover, that the defendant had been involved in prior illegal activity. We conclude, therefore, that the trial court did not abuse its discretion in allowing Ponteau to testify for the limited purpose of explaining why the police had deliberately included the defendant's photograph in an otherwise random photographic array.[17]

We now turn to the testimony of Detective Daniels. Daniels had arrested the defendant in connection with the robbery on February 28, 1985, and so testified. The remainder of his testimony on direct examination can be summarized as follows: Daniels frequently worked in plainclothes in the lower Dixwell Avenue area, in the vicinity of Lake Place. He had seen the defendant in that area, around the time of the robbery, "once or

---

[17] The defendant also argues that his right to cross-examine Ponteau was impaired because Ponteau had previously arrested the defendant, and the defendant could not risk eliciting this fact upon cross-examination. Given the narrow scope of Ponteau's testimony, and the defendant's failure to show how it prejudiced him, we conclude that the defendant's failure to cross-examine was a tactical decision that did not impair his rights to confrontation.

twice a week." He had seen the defendant wearing a knit cap. On cross-examination, Daniels described the cap as "most commonly used [by] militant-type Blacks." He also admitted that the lower Dixwell Avenue area had many black residents and that, at the time of the robbery, it was a high-crime area. On redirect examination, Daniels testified that he had known the defendant for a number of years, that he knew his mother and grandmother, and that he had been to the defendant's house. On further redirect, he testified that he had "stopped" the defendant "a couple of times" in the lower Dixwell Avenue area.

At trial, the state advanced three principal grounds on which the testimony given by Daniels was relevant: (1) to show that the defendant was in the habit of walking in the lower Dixwell Avenue area, relevant because the robber escaped on foot; (2) to show that the defendant wore a hat similar to that described by the victim; and (3) to establish that the defendant had been arrested on February 28, relevant because the next witness, a police matron, would testify that she processed the defendant and prepared a booking sheet on that date. The defendant claims that Daniels' testimony prejudiced him by "creat[ing] the impression" that he had been involved in unspecified prior crimes and was "considered by the police to be an unsavory character." This prejudice, he argues, far outweighed any possible relevance Daniels' testimony might have had.

Evidence of a defendant's prior misconduct is not ordinarily admissible to prove his bad characer or criminal tendencies. *State* v. *Ibraimov,* 187 Conn. 348, 352, 446 A.2d 382 (1982). Nowhere in the testimony of which the defendant complains, however, is there any reference to prior crimes of the defendant; cf. *State* v. *Nardini,* 187 Conn. 513, 522, 447 A.2d 396 (1982); or any evidence suggesting that he had an evil disposition or a propensity to commit the crimes with which

he was charged. Cf. *State* v. *Braman,* supra, 675; *State* v. *Williams,* supra, 108–109. *United States* v. *Williams,* 739 F.2d 297, 299–300 (7th Cir. 1984), on which the defendant relies, is similarly inapposite. The *Williams* court held that a police detective's testimony that he knew the defendant as " 'Fast Eddie' might suggest to the jury that the defendant had some sort of history of or reputation for unsavory activity. . . . [T]he detective's statement was tantamount to testimony about a defendant's character that is proffered to show the probability that the defendant acted in conformity with that character in a particular case." Id. Daniels' testimony, by contrast, contained no such blatantly prejudicial reference. The only two statements which arguably portrayed the defendant in a negative light were the description of his cap as one worn by "militant-type Blacks," and the statement that Daniels had "stopped" the defendant "a couple of times."[18] The first remark was unintentionally elicited on cross-examination, and was the subject of no specific ruling by the trial court. Rather than moving to strike the remark, moreover, defense counsel emphasized it to accentuate the differences between Daniels' description and the victim's description of the cap worn by the robber. The second statement, considered in its context, does little more than explain how Daniels was able to recognize the defendant on the street, an issue earlier raised by the defendant in his cross-examination. The evidence that Daniels had "stopped" the defendant did not unmistakably imply that the defendant had been involved in unspecified prior criminal activity. In light of Daniels' testimony that he had known the defendant and his family for many years, and had visited his house, the jury could reasonably have assumed that Daniels had "stopped" the defendant to converse socially. Any

[18] The defendant does not argue that Daniels' testimony to the fact of his arrest in this case was prejudicial.

possible prejudice the remark might have caused was mitigated, moreover, by the defendant's subsequent recross-examination, during which Daniels stated that the defendant had not been doing anything illegal when he had encountered him on the street. We conclude, therefore, that the trial court did not abuse its discretion in allowing Daniels' testimony to come before the jury.

There is no error.

In this opinion the other justices concurred.