******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* TINESSE TILUS
(AC 35567)

Sheldon, Prescott and Pellegrino, Js.

*Argued January 5—officially released May 26, 2015*

(Appeal from Superior Court, judicial district of Fairfield, Kavanewsky, J.)

*Janice N. Wolf*, assistant public defender, for the appellant (defendant).

*Emily D. Trudeau*, deputy assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, and *Joseph J. Harry*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Tinesse Tilus, appeals from the judgment of conviction, rendered after a jury trial, of robbery in the first degree in violation of General Statutes § 53a-134 (a) (2). On appeal, the defendant claims that his conviction should be reversed and his case should be remanded for a new trial on grounds that (1) the trial court violated his sixth amendment right to conflict free counsel by inadequately canvassing him as to his desire to proceed with retained counsel who had previously represented both him and one of his codefendants in the case; (2) the trial court violated his sixth amendment right to present a defense by inducing that same codefendant, a key defense witness, to invoke his fifth amendment privilege against self-incrimination and not testify; (3) the trial court abused its discretion by declining to admit certain physical evidence received from his nontestifying codefendant in support of his theory of defense; and (4) the prosecutor violated his right to a fair trial by committing several improprieties in closing and rebuttal arguments to the jury. We affirm the judgment of the trial court.

The jury was presented with the following evidence upon which to base its verdict. On December 28, 2011, at approximately 8 p.m., Rene Aldof and his employee, Ramon Tavares, were tending Aldof's store, the Caribbean-American Grocery and Deli (store) located at 263 Wood Avenue in Bridgeport, when four men entered the store. One of the men was the defendant, whom Aldof recognized as "Tinesse," a regular customer of the store. Aldof also recognized a second man, Jean Barjon, but did not recognize either of the two other men. One of the unknown men pulled out a handgun and demanded that Aldof give him the money, while the other three men, including the defendant, "encased" him in an effort to prevent his escape. Aldof was able to push past the men and exit the store, pursued by one of the men, who unsuccessfully attempted to restrain him by grabbing his coat. Aldof ran into a nearby laundromat, where he held the door shut to prevent his pursuer from coming in behind him.

Tavares, who remained in the store after Aldof's departure, was stationed in a plexiglass enclosed booth where the cash register was located. A man approached the booth, pointed a handgun at Tavares' head and ordered him to open the door. Tavares immediately complied, and the man entered the booth. The man, still holding the gun in his outstretched hand, "turned" Tavares to face the wall and told him to place his hands up against the wall. Tavares "felt something in the back of [his] head," and the man demanded that he "give him all the money." The man took Tavares' cell phone and wallet, and the money in the cash register. Tavares asked the man to return his wallet, as it contained his papers, and the man did so, keeping only the cash inside

the wallet. Tavares stood facing the wall until he heard the man exit the store.[1]

Patrol Officer Elizabeth Santora, of the Bridgeport Police Department, was on her dinner break, driving down Wood Avenue in a marked police cruiser, when she observed a person later identified as Aldof, standing outside of the Laundromat, waving his arms and screaming "like a crazy person because [he] thought that [he] was going to die." Aldof told Santora that he had just been robbed at gunpoint, and he pointed to one of his alleged assailants, who was still in the immediate vicinity. Once Santora focused on the suspect, he started walking fast down Wood Avenue. Santora immediately followed him in her cruiser, and Aldof followed on foot, shouting that the man had just robbed him.

Santora kept the suspect in her sights as he broke into a run and turned the corner onto Sherwood Avenue. There, Santora observed the suspect come to a halt next to several trash cans outside of the Esquina Latina Restaurant. Santora stopped her cruiser, got out of her vehicle and shouted, "don't even fucking move." The suspect heeded the order. Santora approached the suspect, gave him a "quick patdown," then grabbed him by the back of his pants and pulled him toward the police cruiser.

As Santora approached the cruiser with the suspect in tow, she observed a white Nissan Altima that had been parked on Sherwood Avenue begin "pulling off" into the street. Aldof, then positioned on the corner of Wood and Sherwood Avenues, told Santora that the three men in the Altima had also been involved in the robbery. Santora flagged down the vehicle and told its driver to stop the car and give her the keys. The driver obeyed. The first suspect and the three men in the Altima were detained for questioning. The men were later identified as Guillatemps Jean-Philippe, Jean Louis, Barjon, and the defendant. Aldof confirmed that the detainees were the same four men who had robbed his store.

Once the scene had been secured, Santora and several other members of the Bridgeport Police Department searched the surrounding area for the gun that allegedly had been used to perpetrate the robbery. A nine millimeter pistol was discovered on the ground in the vicinity of the trash cans where Santora had apprehended the fleeing suspect. The pistol was taken into evidence and later sent to the firearm and tool mark division of the state forensic science laboratory for testing and analysis. The pistol was examined, test fired and found to be operable. A search of a national database revealed that the pistol had been used in a recent incident in New Jersey.

The defendant was arrested and charged with one count each of conspiracy to commit robbery in the first

degree in violation of General Statutes §§ 53a-48 and 53a-134, and robbery in the first degree in violation of § 53a-134. The defendant pleaded not guilty to the charges and elected a jury trial.

The defendant, who testified in his own defense, challenged Aldof's account of events on the evening of the alleged robbery. The defendant testified that he had known Aldof since he was a small child because their families came from the same part of Haiti. He also testified that he had been in Aldof's store "many times," and that on such occasions he had observed Aldof running an illegal Dominican lottery. The defense claimed that Aldof had concocted his story about the alleged robbery to avoid paying out a large sum of money to one of the alleged coconspirators, Jean-Philippe, who had gone to Aldof's store alone that evening to collect on a winning lottery ticket he had bought there.

The defendant explained that on the night of the alleged robbery, his friend, Barjon, had come to his house at about 7 p.m. and asked him if he would like to take a ride to New Haven. When he agreed to do so, he got in Barjon's car, where Jean-Philippe and another man he did not know were seated in the rear passenger seat. The defendant was told that Barjon had agreed to drive the two men to the train station in New Haven. Instead, however, Barjon drove to Aldof's store and parked his car on the corner of Wood and Sherwood Avenues. The defendant testified that once they arrived at the store, Jean-Philippe, "with no mention, nothing," got out of the car and entered the store. The defendant and the other two men remained in the parked car, where the defendant called a friend on his cell phone. Shortly thereafter, while he was still on the phone, he saw Jean-Philippe and a police officer approaching the vehicle. When Jean-Philippe tried to open the car door, the police officer ordered him to stop. The defendant and the other two men were then escorted into a police van, questioned, and later arrested.

Jean-Philippe also testified for the defense.[2] Jean-Philippe stated that he did not know the defendant, but that he was a friend of Barjon. He testified that he had gone to Aldof's store on the evening of December 28, 2011, to collect $39,000 in lottery winnings, but that Aldof had refused to pay him. Jean-Philippe claimed that he went into the store alone while the other three men remained in the car, drinking coffee and smoking cigarettes. In the store, Jean-Philippe met Aldof, whom he referred to as the "old man," and produced his receipt with the winning lottery numbers and showed it to him. In response, Aldof left the store and walked into the laundromat next door. When Jean-Philippe was later arrested, he told police that he had played the lottery at the store and had gone back there to collect his money.[3] Jean-Philippe also claimed not to have seen anyone but Aldof in the store that evening, although he

testified that he did not know whether someone else may have been in the store, in the section "where they play the Lotto . . . ."[4] Jean-Philippe denied having a pistol.

The jury found the defendant guilty of robbery in the first degree. The jury found him not guilty, however, of conspiracy to commit robbery in the first degree. The court rendered judgment in accordance with the jury's verdict, sentencing the defendant to a term of twelve years incarceration, execution suspended after eight years, followed by four years of probation. The defendant appeals from that judgment.

I

The defendant first claims that the trial court's failure to secure a valid waiver violated his constitutional right to conflict free representation. Specifically, he claims that the court, having knowledge of his trial counsel's conflict of interest due to his prior representation of the codefendant, Barjon, improperly relied on the defendant's ill-advised representations that he wanted to proceed to trial with his retained counsel rather than conducting a more thorough canvass regarding his trial counsel's conflict of interest.[5] We disagree.

The following additional facts, which are undisputed in the record, are relevant to our resolution of the defendant's claim. The defendant was arraigned on December 29, 2011, at which time he was assisted by counsel from the Office of the Public Defender. His codefendant, Barjon, was arraigned on the same day, and he, too, was assisted by counsel from the Office of the Public Defender. One month later, on January 31, 2012, Attorney Eroll Skyers filed appearances in both cases. Shortly thereafter, on February 7, 2012, the defendant entered a plea of not guilty before Judge Robert J. Devlin, Jr. At that time, Skyers informed Judge Devlin that he represented both the defendant and Barjon in their pending cases. On April 9, 2012, in front of Judge Devlin, the defendant appeared with Skyers and rejected the state's plea offer, and his case was placed on the trial list.

On October 2, 2012, Skyers appeared in court before Judge Devlin with Barjon, who had communicated, through counsel, his intention to plead guilty under the *Alford* [6]doctrine to the charge of conspiracy to commit robbery in the first degree. Barjon failed his plea canvass, however, and thus the court vacated his guilty plea.[7] Because, at that time, it was clear that both Barjon and the defendant intended to proceed to trial, the court raised with Skyers the potential conflict of interest presented by his continued representation of both men. In this regard, the court focused initially on problems associated with Skyers' continued representation of Barjon. Skyers responded by stating for the record that when Barjon and the defendant first came to him seek-

ing joint representation, he had informed them that there could be a potential conflict if both cases proceeded to trial. Although both men persisted in their desire to have him represent them, they agreed that Barjon would retain other counsel if his case was not resolved by entering a guilty plea.

The prosecutor then questioned whether, under the circumstances, Skyers' continued representation of the defendant was advisable. On that score, the prosecutor noted, specifically, the possibility that the defendant would call Barjon to testify in his defense. The court stated, "I guess we'd have to cross that bridge when we come to it. I think, though, that Mr. Barjon would have a fifth amendment right not to testify and therefore could assert [it], and whoever represented him would probably advise him to do so before his case was concluded. And I would think that—he could choose to testify, I guess, but he could not be compelled to testify against his interest. And I suspect that the lawyer would advise that, but maybe not."

The court then asked Skyers if he had discussed the matter with the defendant, and he confirmed that he had, stating, "at the time that I was retained by [the defendant], he's actually who came to me first, I advised him that I'd be happy to represent him. He . . . indicated that Mr. Barjon wanted to speak to me. And in both of their presence, I indicated that potentially this would be a conflict if I represented both of them, but they persisted and they agreed on my representation in the early stages of this case." Skyers informed the court that the defendant was present, if the court wanted to question him.[8] The following colloquy then took place between the court and the defendant:

"The Court: So, if Attorney Skyers continues to represent you, Mr. Tilus, he's asking that he basically be taken off of Mr. Barjon's case and Mr. Barjon get his own lawyer on the case, which would leave Mr. Skyers just representing you. Understand so far?

"[The Defendant]: Yes. To represent me.

"The Court: But—correct. But it also means everything that Mr. Barjon said to Attorney Skyers is protected by what we call the attorney-client privilege. It's confidential information that a person can talk to the lawyer without fear of a lawyer using that information against a person . . . we want people to talk to their lawyers, and we want them to have confidence that what is said is kept private between the client and the lawyer. Understand what I'm trying to get at there?

"[The Defendant]: Yes.

"The Court: What that means is that whatever information Mr. Skyers may have learned from Mr. Barjon, you know, he could not use that in a way that would hurt Mr. Barjon; he could use that in a way that would, you know, make the case against Mr. Barjon easier to

prove by the state. That information would have to stay confidential between Attorney Skyers and Mr. Barjon. And he could not use that or reveal that in representing you. Do you understand that?

"[The Defendant]: Yeah, I understand that.

"The Court: Okay.

"[The Defendant]: But [I have] spoke[n] to my lawyer. Mr. Skyers, all the time, me and him have a separate case. . . .

"The Court: Right. But what I'm saying is that he talked to Barjon—let's assume, just say . . . he knew something from Barjon that might help your case, I don't know that he did, but if he did, he couldn't use that. He has to keep his . . . information from Barjon separate and confidential and secret. So, do you understand that?

"[The Defendant]: Yes.

"The Court: So, in some ways—now, I don't know what Mr. Barjon [is] going to do. I assume he's going to hire his own lawyer, and whatever happens with that case, happens with that case. I'm more concerned with yours because I think I'm going to let Mr. Skyers out of Mr. Barjon's case. But with respect to you, do you still wish to have Mr. Skyers as your lawyer under those circumstances?

"[The Defendant]: Yes.

"The Court: Would you like to consult with another lawyer, a different lawyer about this, you know, before we go forward on your case?

"[The Defendant]: No. . . .

"The Court: Okay. All right. And, Attorney Skyers, from your point of view, have I correctly framed the issue as far as—is there more that should be put on the record here?

"[Skyers]: Absolutely have, Your Honor. Yes."

Against this factual background, the defendant argues that Skyers' joint representation of himself and Barjon in the pretrial phase of the proceedings gave rise to a conflict of interest which jeopardized the defendant's sixth and fourteenth amendment right to counsel. He further argues that the court's inquiry into the matter was not adequate to apprise him of the risks of continued representation by Skyers and, thus, no valid waiver was obtained.

We begin our analysis of the defendant's claim by setting forth the applicable standard of review. "Almost without exception, we have required that a claim of ineffective assistance of counsel must be raised by way of habeas corpus, rather than by direct appeal, because of the need for a full evidentiary record for such [a] claim. . . . On the rare occasions that we have

addressed an ineffective assistance of counsel claim on direct appeal, we have limited our review to allegations that the defendant's sixth amendment rights had been jeopardized by the actions of the trial court, rather than by those of his counsel. . . . We have addressed such claims, moreover, only where the record of the trial court's allegedly improper action was adequate for review or the issue presented was a question of law, not one of fact requiring further evidentiary development. . . . We, therefore, review the defendant's claim as a question of law and, as with all questions of law, our review is plenary." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Parrott*, 262 Conn. 276, 285–86, 811 A.2d 705 (2003).

"The sixth amendment to the United States constitution as applied to the states through the fourteenth amendment, and article first, § 8, of the Connecticut constitution, guarantee to a criminal defendant the right to effective assistance of counsel. *Powell* v. *Alabama*, 287 U.S. 45, 69, 53 S. Ct. 55, 77 L. Ed. 158 (1932); *Festo* v. *Luckart*, 191 Conn. 622, 626, 469 A.2d 1181 (1983). Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest. *Wood* v. *Georgia*, 450 U.S. 261, 271, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981)."[9] (Internal quotation marks omitted.) *State* v. *Parrott*, supra, 262 Conn. 286, quoting *State* v. *Crespo*, 246 Conn. 665, 685–86, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999). "This right applies not only to the trial itself, but to any critical stage of a criminal proceeding." (Internal quotation marks omitted.) *State* v. *Gaines*, 257 Conn. 695, 706–707, 778 A.2d 919 (2001).

Conflicts of interest arise in circumstances where the defense lawyer's representation violates, or is likely to violate, certain ethical rules. "Cases involving conflicts of interest usually arise in the context of representation of multiple codefendants by one attorney where the attorney adduces evidence or advances arguments on behalf of one defendant that are damaging to the interests of the other defendant. *Phillips* v. *Warden*, 220 Conn. 112, 135–36, 595 A.2d 1356 (1991). A conflict of interest also arises if trial counsel simultaneously represents the defendant and another individual associated with the incident and that representation inhibits counsel's ability to represent the defendant." (Internal quotation marks omitted.) *State* v. *Cruz*, 41 Conn. App. 809, 812, 678 A.2d 506, cert. denied, 239 Conn. 908, 682 A.2d 1008 (1996). "An attorney has an actual, as opposed to a potential, conflict of interest when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action. . . . An attorney has a potential conflict of interest if the interests of the defendant may place the attorney under inconsistent duties at some time in the future." (Cita-

tions omitted; internal quotation marks omitted.) *United States* v. *Perez*, 325 F.3d 115, 125 (2d Cir. 2003).

The trial court has a duty to explore the possibility of a conflict when it is alerted to the fact that the defendant's constitutional right to conflict free counsel is in jeopardy. *State* v. *Crespo*, supra, 246 Conn. 697. "There are two circumstances under which a trial court has a duty to inquire with respect to a conflict of interest: (1) when there has been a timely conflict objection at trial . . . or (2) when the trial court knows or reasonably should know that a particular conflict exists . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Parrott*, supra, 262 Conn. 285–87. "The purpose of the court's inquiry . . . is to determine whether there is an actual or potential conflict, and, if there is an actual conflict, to inquire whether the defendant chooses to waive the conflict or whether the attorney must withdraw." *State* v. *Figueroa*, 143 Conn. App. 216, 226, 67 A.3d 308 (2013).

"Just as the right to assistance of counsel may be waived in favor of self-representation; see *Faretta* v. *California*, 422 U.S. 806, 819, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975); *State* v. *Carter*, 200 Conn. 607, 611, 513 A.2d 47 (1986); so may a defendant waive the right to conflict-free representation. The trial court must, however, determine on the record that such a waiver is knowing and intelligent. *Glasser* v. *United States*, [315 U.S. 60, 71, 62 S. Ct. 457, 86 L. Ed. 680 (1942)]; *United States* v. *Curcio*, 680 F.2d 881, 888–89 (2d Cir. 1982); *State* v. *Tyler-Barcomb*, 197 Conn. 666, 670, 500 A.2d 1324 (1985), cert. denied, 475 U.S. 1109, 106 S. Ct. 1518, 89 L. Ed. 2d 916 (1986). If the defendant reveals that he is aware of and understands the various risks and pitfalls, and that he has the rational capacity to make a decision on the basis of this information, and if he states clearly and unequivocally . . . that he nevertheless chooses to hazard [the] dangers of waiving conflict-free representation, then his waiver may appropriately be accepted. *United States* v. *Curcio*, supra [888]; *State* v. *Tyler-Barcomb*, supra [670]. The waiver is not vitiated simply because the defendant, with the benefit of hindsight, might have chosen differently. A defendant need not be prescient in order to waive knowingly and intelligently the right to conflict-free representation. *United States* v. *Curcio*, supra [888]." (Internal quotation marks omitted.) *State* v. *Williams*, 203 Conn. 159, 167–68, 523 A.2d 1284 (1987).

In the present case, the record shows that the court explored the potential conflict of interest when the issue was raised by the prosecutor. The court heard from Skyers and the defendant. Skyers represented to the court that he had discussed the potential conflict of interest with the defendant. The court then informed the defendant of the risks attendant to Skyers' representation of him, namely, Skyers' continuing obligations

to Barjon and the ethical barrier to using any information that he had acquired as a result of representing Barjon. The defendant confirmed that he was aware of Skyers' obligations to Barjon, and he expressed his desire to proceed with his retained counsel.

The defendant argues that the court's inquiry into the matter was not sufficient, in that the court did not adequately warn him as to the problems that could potentially arise as a result of Skyers' earlier joint representation of him and Barjon. The defendant argues that a knowing and intelligent waiver of conflict free counsel requires the type of inquiry that has been adopted by the United States Court of Appeals for the Second Circuit. Specifically, he claims: "[T]he court should advise the defendant of his right to separate and conflict-free representation, instruct the defendant as to problems inherent in being represented by an attorney with divided loyalties, allow the defendant to confer with his chosen counsel, encourage the defendant to seek advice from independent counsel, and allow a reasonable time for the defendant to make his decision." *United States* v. *Curcio*, supra, 680 F.2d 890. Review of our appellate decisions addressing this issue, however, reveals that "[t]he [appropriate] course . . . followed by the court in its inquiry *depends upon the circumstances of the particular case.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Drakeford*, 261 Conn. 420, 427, 802 A.2d 844 (2002); accord *DaSilva* v. *Commissioner of Correction*, 132 Conn. App. 780, 789–90, 34 A.3d 429 (2012).

For example, in *State* v. *Tyler-Barcomb*, supra, 197 Conn. 671, a case involving joint representation, our Supreme Court held that where defense counsel and the trial court had previously advised two codefendants of their attorney's possible conflict of interest in jointly representing them, then again made them aware of the risks potentially arising from such a conflict immediately before jury selection, the defendants' stated willingness to proceed despite knowledge of those risks constituted a waiver of their right to conflict free representation.

In *State* v. *Williams*, supra, 203 Conn. 168, a case in which defense counsel notified the court mid-trial that a conflict prevented him from pursuing a line of defense implicating a third party look-alike, the defendant, on appeal, claimed that the court's canvass of him was deficient because the court failed to properly determine whether he was fully aware of the " 'factual and legal parameters' " of his waiver. Id. Our Supreme Court rejected the defendant's claim, reasoning that the defendant had been informed of the pitfalls associated with his counsel's continued representation both by the court and by his attorney. The court stressed that defense counsel "had an ethical obligation to disclose to the defendant the circumstances of the conflict and

its effect upon his ability to exercise independent professional judgment on the defendant's behalf." Id., 169.

Here, the court advised the defendant as to the ethical limitations placed on his attorney as a result of his pretrial representation of Barjon. Skyers informed the court that he, too, had made the defendant aware of the implications of the joint representation when the defendant initially retained him almost nine months before the start of trial. The defendant confirmed on the record that such discussions had indeed taken place. The court was entitled to rely on these representations in determining whether the defendant's waiver was knowing and intelligent.[10] "[D]efense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial. Absent special circumstances, therefore, trial courts may assume either that [the potentially conflicted] representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist. . . . [T]rial courts necessarily rely in large measure upon the good faith and good judgment of defense counsel."[11] (Emphasis omitted; internal quotation marks omitted.) *State* v. *Crespo*, supra, 246 Conn. 696, quoting *Cuyler* v. *Sullivan*, 446 U.S. 335, 346–47, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980); see also *State* v. *Williams*, supra, 203 Conn. 168. In addition, it is important that the court defer to counsel where appropriate and refrain from unnecessarily interfering in the attorney-client relationship. See *State* v. *Tyler-Barcomb*, supra, 197 Conn. 670 ("[t]he scope of the trial court's inquiry should be thorough . . . yet not be overly intrusive into the attorney-client relationship").

The defendant argues that his waiver was invalid because the court failed to elicit narrative responses from him as to his understanding of the risks of Skyers' continued representation of him. A similar argument was made and rejected in *DaSilva* v. *Commissioner of Correction*, supra, 132 Conn. App. 790–91, wherein this court determined that "[a]lthough the trial court's inquiry of the petitioner was brief, the petitioner's responses were sufficient under the circumstances to constitute a knowing and intelligent waiver of the potential conflict." In *State* v. *Williams*, supra, 203 Conn. 172, our Supreme Court, citing *Curcio*, agreed that narrative responses furnish "additional assurance that the defendant's waiver [is] knowing and intelligent," but determined that if the record otherwise demonstrates that the defendant has made a valid waiver, "the [court's] failure to elicit narrative responses does not, in itself, justify reversal." Here, the record establishes that the defendant was aware of the possible consequences of his attorney's joint representation well in advance of the court's canvass, and his responses to the court's questions were clear and unequivocal. Under these circumstances, the defendant's waiver was valid.

The defendant also argues that the court should have encouraged him to seek the advice of independent counsel before deciding whether to waive his right to conflict free counsel, and afforded him additional time to do so. We are not persuaded for two reasons. First, our cases do not suggest that such consultation is required. See, e.g., *DaSilva* v. *Commissioner of Correction*, supra, 132 Conn. App. 790–91 (it was not necessary for court to advise petitioner about obtaining independent counsel). Second, the record here reveals that the court did give the defendant the opportunity to consult with another lawyer before going forward with his case, but the defendant declined to do so, clearly stating that he wanted to have Skyers continue to represent him.

In any case involving a possible conflict of interest, the court must be mindful of the defendant's constitutional right to the counsel of his choice; see *United States* v. *Bubar*, 567 F.2d 192, 204 (2d Cir.) (recognizing defendant's "constitutional right to be represented by counsel of his own choice"), cert. denied, 434 U.S. 872, 98 S. Ct. 217, 54 L. Ed. 2d 151 (1977); when making a determination as to the soundness of the defendant's determination to move forward with his present counsel despite the potential risks. "[O]ur chosen system of criminal justice is built upon a truly equal and adversarial presentation of the case, and upon the trust that can exist only when counsel is independent of the Government. Without the right, reasonably exercised, to counsel of choice, the effectiveness of that system is imperiled." (Internal quotation marks omitted.) *State* v. *Peeler*, 265 Conn. 460, 472, 828 A.2d 1216 (2003), cert. denied, 541 U.S. 1029, 124 S. Ct. 2094, 158 L. Ed. 2d 710 (2004), quoting *Caplin & Drysdale, Chartered* v. *United States*, 491 U.S. 617, 648, 109 S. Ct. 2646, 105 L. Ed. 2d 528 (1989) (Blackmun, J., dissenting).

Here, the defendant persisted in his desire to proceed to trial with the assistance of his chosen counsel. In light of the fact that the only anticipated impediment to Skyers' continued representation of the defendant was the possibility that Barjon would choose to testify on the defendant's behalf, which the court correctly deemed unlikely given Barjon's decision to proceed to trial, it properly deferred to the defendant's expressed desire to proceed, notwithstanding the potential conflict.

II

The defendant next claims that the trial court, *Kavanewsky, J.*, violated his sixth amendment right to present a defense by inducing his codefendant, Barjon, to invoke his fifth amendment privilege against self-incrimination and not testify. More specifically, the defendant argues that the court substantially interfered with his right to present a defense by continually questioning Barjon, whom the defendant claims would have

testified favorably to the defense, as to his willingness to testify, and thereby causing him to refuse to testify at trial. The record establishes, however, that the court properly advised Barjon of his constitutional rights without exercising any undue influence upon him. Accordingly, we reject the defendant's claim.

As a preliminary matter, we note that the defendant did not object to the court's inquiry of Barjon at trial. Because the record is adequate for review, however, and the defendant's claim is of constitutional magnitude, we review that claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[12]

The following additional facts and procedural history are relevant to our review of this claim. On October 17, 2012, Barjon appeared to testify on the defendant's behalf.[13] When he did so, he was questioned by the court outside the presence of the jury and advised of his fifth amendment privilege not to testify. Specifically, the court cautioned Barjon that by testifying, he would subject himself to questioning by both the defendant and the state, and that any statements he made in the course of his testimony could be used against him in his pending case.[14] Upon receiving this advisement of his rights, Barjon expressed a desire to discuss the matter further with his new counsel, Attorney Matthew Coulute. Barjon was later brought back into the courtroom, where he stated that he still intended to testify for the defendant. The defense then proceeded with its case, calling as its first witness, the defendant's alleged coconspirator, Jean-Philippe. Following Jean-Philippe's testimony, outside the presence of the jury, the court held a sidebar conference with the prosecutor, Skyers and Coulute. Barjon was then brought back before the court, which inquired of him again whether or not he wanted to testify:

"The Court: [Attorney] Coulute and Mr. Barjon, have you made a decision on whether you want to testify in this case?

"Barjon: I did.

"The Court: Are you going to testify or not testify?

"Barjon: Not testify.

"The Court: [Attorney] Coulute, anything else?

"Attorney Coulute: No, Your Honor. Thank you."

On appeal, the defendant argues that the court's conduct caused Barjon to invoke his privilege against self-incrimination and, thus, violated the defendant's constitutional right to present a defense. He further argues that because Barjon did not testify, he was deprived of a credible witness whose testimony was critical to his defense, without whom he was unable to introduce "crucial evidence regarding lottery tickets" sold at Aldof's store. See part III of this opinion.

The defendant has a fundamental constitutional right to present a defense. See *Washington* v. *Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967). "The federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The sixth amendment . . . [guarantees] the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies." (Citation omitted; internal quotation marks omitted.) *State* v. *Cerreta*, 260 Conn. 251, 260–61, 796 A.2d 1176 (2002). The defendant's right to present a defense is not absolute, however; "[t]he right may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." (Internal quotation marks omitted.) *Rock* v. *Arkansas*, 483 U.S. 44, 55, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987). "The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor* v. *Illinois*, 484 U.S. 400, 410, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988).

"The function of the court in a criminal trial is to conduct a fair and impartial proceeding. . . . A trial judge in a criminal case may take all steps reasonably necessary for the orderly progress of the trial. . . . When the rights of those other than the parties are implicated, [t]he trial judge has the responsibility for safeguarding both the rights of the accused and the interests of the public in the administration of criminal justice." (Citation omitted; internal quotation marks omitted.) *State* v. *Torres*, 60 Conn. App. 562, 569–70, 761 A.2d 766 (2000), cert. denied, 255 Conn. 925, 767 A.2d 100 (2001); see also *State* v. *Roma*, 199 Conn. 110, 114–15, 505 A.2d 717 (1986). Accordingly, it is within the court's discretion to warn a witness about the possibility of incriminating himself. *United States* v. *Arthur*, 949 F.2d 211, 215 (6th Cir. 1991).

The court, however, abuses its discretion if it actively interferes in the defendant's presentation of his defense, and thereby pressures a witness into remaining silent. See *Webb* v. *Texas*, 409 U.S. 95, 93 S. Ct. 351, 34 L. Ed. 2d 330 (1972). In assessing whether the court has acted unreasonably, the reviewing court looks to the factual circumstances surrounding the witness' invocation of his privilege not to testify. "The dispositive question in each case is whether the government actor's interference with a witness's decision to testify was 'substantial.'" *United States* v. *Serrano*, 406 F.3d 1208, 1216 (10th Cir.), cert. denied, 546 U.S. 913, 126 S. Ct. 277, 163 L. Ed. 2d 247 (2005).

In *United States* v. *Arthur*, supra, 949 F.2d 215, on which the defendant relies, the District Court advised

the witness that it was not in his best interest to testify; the court stepped into the role of the witness' advocate, repeatedly cautioning the witness about the perils of testifying, despite the witness' expressed willingness to do so. In response to the court's badgering, the witness invoked his privilege. Id., 216. On the basis of these facts, the United States Court of Appeals for the Sixth Circuit held that the District Court had committed reversible error by inducing the witness to exercise his fifth amendment right not to testify. Id.

Likewise, in *Webb* v. *Texas*, supra, 409 U.S. 96, the United States Supreme Court found a due process violation where the trial court had admonished the defendant's witness that he did not have to testify, implying that it expected him to perjure himself if he did so, and warned him that it would personally see to it that his case be presented to the grand jury so he could be indicted for perjury if such testimony was offered.

In the present case, the record is devoid of any such improper conduct on the part of the court. Here, it was within the court's discretion to inform Barjon of his fifth amendment privilege against self-incrimination and of the possible consequences of testifying. The court's advisement of rights was neutral and lacked the coercive admonitions present in *Arthur* and *Webb*. It is also important to note that Barjon had legal representation at the time of his advisement and was given the opportunity by the court to consult with his attorney following the court's canvass, thereby undermining the defendant's claim that Barjon's will was overborne by the court. See *United States* v. *Serrano*, supra, 406 F.3d 1216 ("[t]he potential for unconstitutional coercion by a government actor significantly diminishes . . . if a defendant's witness elects not to testify after consulting an independent attorney" [emphasis omitted]). In light of these factors, we conclude that the court acted properly under the circumstances, and thus that the defendant has failed to show that his constitutional rights were clearly violated by the court's conduct, as required to satisfy the third prong of *Golding*.

### III

The defendant next claims that the trial court abused its discretion by precluding certain lottery ticket evidence on the ground that the defense had failed to lay an adequate foundation as to its authenticity.[15] We disagree.

We review the defendant's claim in accordance with certain well settled legal principles. "The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. . . . Furthermore, the burden to prove the

harmfulness of an improper evidentiary ruling is borne by the defendant. The defendant must show that it is more probable than not that the erroneous action of the court affected the result." (Citation omitted; internal quotation marks omitted.) *State* v. *Brisco*, 84 Conn. App. 120, 132, 852 A.2d 746, cert. denied, 271 Conn. 944, 861 A.2d 1178 (2004).

The following additional facts are relevant to the resolution of the defendant's claim. At trial, the defendant sought to support his defense that Aldof had concocted his story about a robbery to cover up his refusal to honor Jean-Philippe's winning lottery ticket by introducing into evidence several papers that he claimed to be lottery tickets from the store. Outside the presence of the jury, the defendant testified that he had seen Barjon play the lottery at the store on several occasions. He further testified that the tickets he sought to introduce were similar in appearance to those he had previously seen Barjon play, but he could not verify that they were in fact the same lottery tickets.[16] The state objected to the admission of the evidence, arguing that the defense had failed to provide an adequate foundation to authenticate the documents. The court agreed and thus excluded the evidence.

"Authentication is . . . a necessary preliminary to the introduction of most writings in evidence . . . ." (Internal quotation marks omitted.) *State* v. *Colon*, 272 Conn. 106, 188, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005). "The requirement of authentication as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the offered evidence is what its proponent claims it to be. . . . In general, a writing may be authenticated by a number of methods, including direct testimony or circumstantial evidence. . . . Both courts and commentators have noted that the showing of authenticity is not on a par with the more technical evidentiary rules that govern admissibility, such as hearsay exceptions, competency and privilege. . . . Rather, there need only be a prima facie showing of authenticity to the court." (Citation omitted; internal quotation marks omitted.) *Gagliardi* v. *Commissioner of Children & Families*, 155 Conn. App. 610, 618–19, 110 A.3d 512, cert. denied, 316 Conn. 917,      A.3d (2015).

"Once a prima facie showing of authorship is made to the court, the evidence, as long as it is otherwise admissible, goes to the jury, which will ultimately determine its authenticity. . . . The only requirement is that there have been substantial evidence from which the jury could infer that the document was authentic." (Citations omitted.) *State* v. *Berger*, 249 Conn. 218, 233, 733 A.2d 156 (1999); see also Conn. Code Evid. § 9-1.

An item that is offered into evidence, which is claimed to be relevant for a particular purpose—here, presum-

ably, to establish that Aldof had been running an illegal Dominican lottery out of his store—must first be shown to have some connection to the facts in issue. In the present case, however, there was no identifying information on the tickets indicating that they originated from the store, nor did the defendant have any independent knowledge from which the jury reasonably could infer that they did. The defendant did not testify as to who had purchased the tickets, who had issued them, or when they had been created. At best, the defendant's testimony established that Barjon had purchased lottery tickets from the store that looked similar to the proffered evidence. "The law of evidence is agnostic; it does not accept items at face value." C. Tait & E. Prescott, Connecticut Evidence (5th Ed. 2014) § 9.1.2, p. 685; see also *State* v. *Brisco*, supra, 84 Conn. App. 133 (defendant did not provide evidence to prove authorship of unsigned writing and thus court did not err in excluding it).

We conclude that the court did not abuse its discretion in ruling that the defendant failed to establish a prima facie showing of authenticity such that a reasonable juror could find in favor of authenticity.[17]

IV

Finally, the defendant claims that his right to a fair trial was violated by several prosecutorial improprieties during the state's closing arguments. We conclude that, although one of the prosecutor's challenged statements was improper, the defendant was not deprived of his due process right to a fair trial.

The standard we apply to claims of prosecutorial impropriety is well established. "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. . . . [If] a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show . . . that the remarks were improper . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Ross*, 151 Conn. App. 687, 693, 95 A.3d 1208, cert. denied, 314 Conn. 926, 101 A.3d 271 (2014).[18]

A

The defendant first claims that the prosecutor's statements during closing arguments improperly attempted to appeal to the passions of the jury by analogizing

the plight of Aldof to that of a prostitute rape victim. Specifically, the defendant directs our attention to a portion of the state's argument, in which the prosecutor stated: "now, if you take the defendant's story and you say, well, there is a Lotto going on . . . so what? He still robbed Mr. Aldof. That's like saying, well, because someone is a prostitute and she's committing a criminal act, she can't get raped." In rebuttal argument, the prosecutor made similar comments, arguing that the law does not condone either the robbing of drug dealers or the raping of prostitutes.[19]

The defendant submits that the prosecutor's comments constituted an improper appeal to the emotions, passions, and prejudice of the jury. In response, the state argues that the prosecutor used a commonly understood example to illustrate the point that just because a person is engaged in illegal activity, as the defendant had claimed, that would not justify the committing of crimes of violence against him. The state further argues that the prosecutor's statements cannot reasonably be interpreted to imply that armed robbery is similar to rape or that Aldof was comparable to a raped prostitute, as the defendant now claims. We agree with the state and conclude that the prosecutor's remarks, when put in proper context, were not improper.

"[I]t is well established that, [a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . [S]uch appeals should be avoided because they have the effect of diverting the jury's attention from their duty to decide the case on the evidence. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal." (Citation omitted; internal quotation marks omitted.) *State* v. *Crump*, 145 Conn. App. 749, 755, 75 A.3d 758, cert. denied, 310 Conn. 947, 80 A.3d 906 (2013).

That being said, we are cognizant that "[i]n determining whether [prosecutorial impropriety] has occurred [in the course of closing arguments], the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . Nevertheless, the prosecutor has a heightened duty to avoid

argument that strays from the evidence or diverts the jury's attention from the facts of the case." (Internal quotation marks omitted.) *State* v. *Daniel G.*, 147 Conn. App. 523, 555, 84 A.3d 9, cert. denied, 311 Conn. 931, 87 A.3d 579 (2014).

Here, the defendant would have us construe the prosecutor's mention of rape as an improper appeal to the passions of the jury. But we do not decide the defendant's claim in a factual vacuum. The crux of the defense theory at trial was that Aldof fabricated the story about the robbery to avoid having to pay out a large sum of money owed to Jean-Philippe in connection with an illegal lottery he was running out of his store. The prosecutor's comments were a relevant rhetorical device aimed at defeating one possible view of the defense: that Aldof deserved to be robbed because he had been engaged in unlawful activity. Under the circumstances, the prosecutor's comments were not likely to have been misunderstood.

B

The defendant next directs our attention to statements made by the prosecutor referring to the defendant's witness, Jean-Philippe, as "muscle," positing to the jury that Jean-Philippe had been recruited by the defendant to act as an enforcer in the robbery. The prosecutor argued that the defendant "brought muscle out of New Jersey to rob the place." The prosecutor later argued again that "the defendant brought muscle along with Barjon and they went and robbed the place." The defendant argues that it was improper for the prosecutor to refer to the defense witness as "muscle." He further argues that the prosecutor improperly argued facts not in evidence by mischaracterizing the defendant's alleged role in the offense. We agree that these statements were improper.

Jean-Philippe testified that he was from Elizabeth, New Jersey. The state presented evidence that the pistol discovered behind the trash cans where Jean-Philippe was apprehended had been linked to a prior incident in New Jersey. Jean-Philippe stated that three or four days prior to the alleged robbery he was staying with his girlfriend in East Hartford. During that time frame, he said, he asked Barjon where he could "get the Lotto." Barjon directed him to the Caribbean-American Grocery and Deli and drove him to the store, where he purchased a ticket. He testified that on the date of the incident, Barjon picked him up and drove him back to the store so that he could collect $39,000 in lottery winnings.

On cross-examination, the prosecutor challenged Jean-Philippe's account and attempted to elicit testimony from him that his assistance had been sought out by the defendant for the purpose of helping him collect winnings on a lottery ticket that the defendant had

purchased. Jean-Philippe denied the prosecutor's suggestion, as demonstrated in the following colloquy:

"Q. Okay. And you're saying you played the Lotto out of the Caribbean-American store in Bridgeport; correct?

"A. Yes.

"Q. And when did you buy that ticket?

"A. Between December 24, 25.

"Q. The 24th, 25th. So, you were in Connecticut on the 24th or 25th of December, 2011?

"A. Yes, I was there.

"Q. And isn't it more accurate that the ticket belonged to [the defendant]?

"A. No, that's not his. I was the one who played with my own money; that's mine.

"Q. And isn't it correct that you and Mr. Louis came out of New Jersey to help [the defendant] collect his winnings?

"A. No, I don't know anything about it.

"Q. And isn't it true that when you came out of New Jersey you brought this firearm that was used in a shooting in New Jersey on the 14th?"

Defense counsel objected on the stated ground that there had been no testimony relating to the specifics of the prior incident in New Jersey. The prosecutor then asked:

"Q. And isn't it true you would help people collect money by being an enforcer?

"A. I have no knowledge about it; I'm not a police officer.

"Q. No. You're not a police officer: you're engaged in an illegal enforcing, helping people collect debts. . . .

"A. No."

In his closing argument, the prosecutor continued to underscore his enforcer theory. The prosecutor argued: "[w]hat motive does the defendant have to commit a robbery? Greed. Would he do it at a place he knew? Is it reasonable? Do you think that these people are going to come forward? He brought muscle out of New Jersey to rob the place."

The prosecutor misstated the evidence. Jean-Philippe testified that Barjon told him where to purchase a lottery ticket, and that Barjon drove him to Aldof's store both prior to and on the date of the incident. He further testified that he had never met the defendant before the evening of the incident. There was no testimony at trial to suggest that Jean-Philippe was in Connecticut to do the defendant's bidding, as the prosecutor had argued. It was improper for the prosecutor to invite

speculation on a matter as to which he attempted, but failed, to elicit any supporting evidence at trial.

Comments, such as those at issue here, attributing to the defendant a plan to import an out-of-state enforcer to carry out the robbery, run afoul of a fair adversarial process, where the sole consideration for the jury should be the evidence presented at trial and whether that evidence supports a determination of guilt. The risk presented by such unsupported arguments is that the jury will accept the prosecutor's representations without evidence on the theory that the prosecutor is privy to information of the sort he proposes by his argument. "A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence." (Internal quotation marks omitted.) *State v. Jones*, 135 Conn. App. 788, 801, 44 A.3d 848, cert. denied, 305 Conn. 925, 47 A.3d 885 (2012).

The prosecutor, as the representative of the state, has considerable influence on jurors. See *State* v. *Martinez*, 143 Conn. App. 541, 574, 69 A.3d 975, cert. granted on other grounds, 310 Conn. 909, 76 A.3d 625 (2013). Accordingly, comments such as those at issue here, in addition to leaving the jury with the impression that the prosecutor may be privy to relevant information not presented at trial, pose the risk that jurors may consciously or unconsciously rely on what they perceive to be the prosecutor's view of the case, rather than their own evidence based judgment.

Having concluded that the prosecutor's comments were improper, we turn to the second step of our analysis, which is to determine whether the impropriety "so infected the trial with unfairness as to make the conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Stevenson*, 269 Conn. 563, 589, 849 A.2d 626 (2004). To determine whether the improper conduct by the prosecutor violated the defendant's right to a fair trial, we consider the factors set forth in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987).

"[O]ur determination of whether any improper conduct by the state's attorney violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, [supra, 204 Conn. 540], with due consideration of whether that [impropriety] was objected to at trial. . . . These factors include the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . . [If] a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show, not only that the remarks were

improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process." (Internal quotation marks omitted.) *State* v. *Ross*, supra, 151 Conn. App. 701.

Here, the defense did not invite the improper comments, no curative measures were taken by the court, and the impropriety was central to a critical issue in the case, more particularly, the prosecutor's comments went to the defendant's theory of defense. Those factors weigh in favor of the defendant. The remaining factors, however, weigh in favor of the state. The impropriety was isolated and not severe, as evidenced by the fact that the defendant did not object to the argument or request a curative instruction. Although a party's failure to object to improper arguments does not preclude a claim of prosecutorial impropriety, "[d]efense counsel's objection or lack thereof allows an inference that counsel did not think the remarks were severe." (Emphasis omitted.) *State* v. *Santiago*, 269 Conn. 726, 759, 850 A.2d 199 (2004).

Finally, the state's case against the defendant was strong. There was testimony presented that the defendant had worked at Aldof's store, and as a result, the jury reasonably could infer that the defendant had knowledge concerning the daily receipts of the store. The defendant also testified that he was aware of a daily lottery operation in the store involving large sums of money. The weapon identified in connection with the robbery was discovered in the location where Jean-Philippe was apprehended by the police, thereby corroborating Aldof's account of the robbery and undermining the defense theory of the incident, as testified to by Jean-Philippe. Finally, Aldof, who had known the defendant for years, identified the defendant as one of the perpetrators of the robbery immediately following the crime. In light of our consideration of the *Williams* factors, we conclude that the isolated improper statements made by the prosecutor did not deprive the defendant of a fair trial.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Tavares testified that he saw one man during the robbery. At trial, Tavares identified the defendant, not in connection with the robbery, but as a customer of the store, who frequently came there to eat.

[2] By the time of the defendant's trial, Jean-Philippe had entered a guilty plea under the *Alford* doctrine; see *North Carolina* v. *Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970); to charges of robbery in the first degree and conspiracy to commit robbery in the first degree in connection with the same incident.

[3] Jean-Philippe testified that the winning ticket had been confiscated by the police.

[4] Jean-Philippe described this section of the store as an area to the left of the store entrance with a "white door . . . ." The record indicates that the area described by Jean-Philippe had been partitioned behind a plexiglass enclosure with a one-way glass window at the time of the robbery, and it was subsequently remodeled. Tavares testified that he was in the plexiglass booth at the time of the robbery.

[5] The defendant claims that his trial counsel's conflict of interest adversely affected his performance in the following ways: (1) his codefendant, Barjon, was required to retain a new lawyer, who advised him not to testify; see part II of this opinion; (2) defense counsel was unable to testify about certain lottery ticket evidence he had received from Barjon; see part III of this opinion; (3) defense counsel was prevented from obtaining a written statement from Barjon to use on the defendant's behalf; and (4) defense counsel was unable to shift blame for the robbery from him to Barjon.

[6] Under *North Carolina* v. *Alford*, 400 U.S. 25, 37, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970), a criminal defendant who enters a guilty plea does not admit guilt but acknowledges that the state has sufficient evidence to convict him. *State* v. *Fairchild*, 155 Conn. App. 196, 199 n.2, 108 A.3d 1162, cert. denied, 316 Conn. 902,     A.3d     (2015).

[7] When canvassed, Barjon did not acknowledge that there was a risk that if he went to trial, the jury could find him guilty as charged. He indicated that he was pleading guilty to help the defendant. He also indicated that he believed a plea would enable him to return to work. On the basis of these representations, the court vacated Barjon's guilty plea.

[8] Jury selection in the defendant's case was scheduled to begin that day.

[9] The defendant has not advanced a claim under the Connecticut constitution; thus, we limit our review to the United States constitution.

[10] On this score, the defendant asserts on appeal that the court failed to determine adequately whether his grasp of English and educational background enabled him to make a knowing and intelligent waiver. However, Skyers, who was in the best position to assess the defendant's English proficiency, never made any representations to the court that his client needed additional assistance.

[11] Moreover, Skyers had a continuing obligation to inform the court and the defendant if he believed his representation was compromised at any later point in the proceedings.

[12] Pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40, "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . [T]he first two [prongs of *Golding*] involve a determination of whether the claim is reviewable . . . and under those two prongs, [t]he defendant bears the responsibility for providing a record that is adequate for review of his claim of constitutional error." (Citations omitted; internal quotation marks omitted.) *State* v. *Elson*, 311 Conn. 726, 743–44, 91 A.3d 862 (2014).

[13] Barjon, who had been released on bond, appeared of his own volition.

[14] The court informed Barjon as follows: "Okay. You have a case still active, and it's pending. It's not been resolved in any fashion, and at some point the state intends to try you on these charges. Now, you have every right not to incriminate yourself. You have every right not to say anything. Even if Mr. Skyers wants you [to] testify, you have every right to say no insofar as it would subject you to any criminal liability. Because anything you say is taken down, it's recorded, and it can and may very well be used against you in your own trial and, I don't know, but it could be evidence that leads to your conviction in that trial. . . . But the fact of the matter is, as a criminal defendant you have every right not to say anything. I know this is not your trial, but I want to impress upon you that you still have the right not to say anything."

[15] The defendant first casts his claim as an issue of constitutional dimension; however, "[d]ecisions on whether a proper foundation has been laid are evidentiary and, therefore, not constitutional in nature." *State* v. *Nunes*, 58 Conn. App. 296, 305, 752 A.2d 93, cert. denied, 254 Conn. 944, 762 A.2d 906 (2000).

[16] The defendant suggested that Barjon had given the tickets to his attorney.

[17] A further obstacle to the defendant's ability to meet his burden on appeal is the limited value of the evidence that he sought to introduce. The state argues, and we agree, that the defense did not purport to show that it was offering Jean-Philippe's winning ticket, and thus the probative value of the evidence was limited to proving that the illegal lottery existed—a matter as to which the jury heard ample testimony from the defense wit-

nesses, which it was free to credit.

[18] The defendant did not object to the comments that he now claims constitute prosecutorial impropriety. "It is well established law, however, that a defendant who fails to preserve claims of prosecutorial [impropriety] need not seek to prevail under the specific requirements of *State* v. *Golding*, [supra, 213 Conn. 239–40], and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test. . . . Our Supreme Court has explained that the defendant's failure to object at trial to each of the occurrences that he now raises as instances of prosecutorial impropriety, though relevant to our inquiry, is not fatal to review of his claims. . . . This does not mean, however, that the absence of an objection at trial does not play a significant role in the determination of whether the challenged statements were, in fact, improper. . . . To the contrary, we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was [improper] in light of the record of the case at the time." (Citations omitted; internal quotation marks omitted.) *State* v. *Maner*, 147 Conn. App. 761, 782, 83 A.3d 1182, cert. denied, 311 Conn. 935, 88 A.3d 550 (2014).

[19] More particularly, the prosecutor argued, "There could [have] been the biggest . . . illegal lottery game in the word occurring out of [Aldof's] Caribbean-American store. It doesn't matter. The law does not recognize the ability to go in and rob from someone when their committing an illegal act. Then every prostitute would be subject to rape. Every person that you know is driving down the road violating the law would be subject to an attack. The law says you pull a handgun, you pull a firearm, you go into a store, you go to the drug dealer on the side of the street and you pull it and you tell him you want his drugs, you want to rape her, that's a crime."