******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JOSE F. NAVARRO
(AC 37725)

DiPentima, C. J., and Alvord and Schaller, Js.

*Argued February 1—officially released April 25, 2017*

(Appeal from Superior Court, judicial district of
Fairfield, Kavanewsky, J.)

*Richard E. Condon, Jr.*, senior assistant public
defender, for the appellant (defendant).

*James A. Killen*, senior assistant state's attorney,

with whom, on the brief, was *John C. Smriga*, state's attorney, and *Tiffany M. Lockshier*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Jose Navarro, appeals from the judgment of conviction, rendered after a jury trial, of attempt to commit burglary in the first degree in violation of General Statutes §§ 53a-49 and 53a-101 (a) (3), threatening in the second degree in violation of General Statutes § 53a-62, interfering with a police officer in violation of General Statutes § 53a-167a, and assault on a police officer in violation of General Statutes § 167c (a) (5). The defendant's identical twin brother, Francisco Navarro (Francisco), was charged with, and convicted of, the same offenses as the defendant, with the exception of the assault on a police officer offense, after the joint trial at which they were jointly represented by defense counsel. On appeal, the defendant claims that (1) the court violated his sixth amendment right to conflict free representation by denying counsel's request to appoint a special public defender to represent him and (2) counsel rendered ineffective assistance by representing him at trial and sentencing while burdened by an actual conflict of interest. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. On May 29, 2013, at 12:42 a.m., the victims, Joseph Kenney and Sharon Root, were awakened by the sound of two men, later identified as the defendant and Francisco, whistling and yelling outside their first floor apartment window. Annoyed by the disturbance, Kenney went to the window and asked the men, "What the fuck do you want?" and "who are you looking for?" One of the men replied, "Shut the fuck up, white boy. I'll fuck you up." After a further exchange, the defendant and Francisco came up to the victims' apartment windows. Francisco attempted to pull the security bars off one of the windows while the defendant attempted to pull the frame off the unbarred window next to it.

As the situation escalated, Kenney told Root to stay as far as she could away from the window, grabbed a framing hammer, and made a series of calls to 911. The defendant and Francisco continued to attempt to gain access to the apartment. As they did so, the defendant and Francisco continued to yell at the victims, threatening at one point to get a gun, shoot Kenney, and rape Root. Kenney testified that Francisco was "more aggressive" than the defendant was during the attempted burglary. For example, Francisco at one point retrieved a plank of wood, which was discarded nearby, and used it to hit the security bars. He also attempted to kick in the rear entrance door to the house while saying "I'm going to get in."

After a few minutes, the sound of police sirens could be heard and the defendant and Francisco left the scene on foot. As one of the responding police officers, Officer

Tom Harper, approached the defendant and Francisco, he asked them to remove their hands from their pockets for safety reasons. The defendant and Francisco refused to comply with this request and began yelling that they knew their rights and that they did not do anything wrong. Harper then approached Francisco, who was closest to him, in an attempt to detain him and frisk him for weapons. Francisco continued to ignore Harper's request that he show his hands, and he became combative, yelling and pulling away as Harper attempted to place him in handcuffs. Around this time, three additional officers arrived on the scene. One assisted Harper in detaining Francisco while the other two attempted to detain the defendant, who, like Francisco, was refusing to remove his hands from his pockets, was yelling at officers, and was attempting to get away. Eventually, the four officers subdued the defendant and Francisco and placed them in separate police cruisers.

Once in their respective police cruisers, the defendant and Francisco continued to struggle, yelling and kicking against the cruiser. Officers testified that the defendant was more aggressive than Francisco was during the arrest process. First, the defendant attempted to kick out the windows of the police cruiser. He then managed to bring his handcuffs under his body and around to the front, and he began banging the handcuffs against the police cruiser windows. Officers asked the defendant to step outside of the vehicle so that they could fix his handcuffs, but he refused to comply and became combative. Eventually, officers were able to remove the defendant from the police cruiser and move his handcuffs into the correct position. After officers placed him back inside the police cruiser, the defendant continued to kick and scream.

When officers detained the defendant and Francisco, Kenney was brought to the arrest location so that he could verify whether the defendant and Francisco were the men that attempted to break into his and Root's apartment. Kenney positively identified both the defendant and Francisco. During the course of the identification process, Francisco was brought outside of the police cruiser, but the defendant, because of his combative behavior, could not be let out of the police cruiser safely, and the defendant had to remain inside the police cruiser while Kenney identified him.

After Kenney positively identified the defendant and Francisco, they were transported to a police station for booking. Once at the police station, the defendant and Francisco remained combative, screaming profanities and refusing to comply with orders from the officers. As a result, they were placed in holding cells to complete the booking process. While inside his cell, the defendant spat on one of the officers assisting in the booking process.

The defendant and Francisco subsequently were

charged with attempt to commit burglary in the first degree, threatening in the second degree, and interfering with a police officer. The defendant further was charged with assault on a police officer for spitting on an officer during the booking process. The same public defender was appointed to represent the defendant and Francisco. After a joint trial, the defendant was convicted of all four charges. Thereafter, the court imposed on the defendant a total effective sentence of twelve years imprisonment, execution suspended after six years, followed by five years of probation. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court, *Devlin, J.*, violated his sixth amendment right to conflict free representation by denying counsel's request that a special public defender be appointed to represent him.[1] The state responds that the court did not violate the defendant's constitutional rights because it conducted an adequate inquiry into the potential conflict of interest raised by counsel and it reasonably concluded that the conflict was too speculative to require the appointment of separate counsel. We agree with the state.

The following additional facts are relevant to this claim. On March 29, 2013, a public defender was assigned to represent jointly the defendant and Francisco. At four pretrial hearings for the defendant and Francisco between August 6, 2013, and April 21, 2014, counsel represented to the court that there was presently no conflict of interest in the joint representation because the defendant and Francisco's defenses were in concert. Additionally, at pretrial hearings on September 5 and November 4, 2013, the defendant and Francisco rejected plea offers from the state.

At a pretrial proceeding on May 29, 2014, the final pretrial hearing before jury selection on June 2, 2014, the following colloquy took place between the court, *Devlin, J.*, and counsel when Francisco's case was called:

"[Defense Counsel]: I'd be asking for an appointment with a special public defender in [Jose's] case, Your Honor.

"The Court: No way. I mean the case goes back to— it's over a year old. These guys are identical twins. You're asking for that now?

"[Defense Counsel]: Your Honor, as the case approaches trial my concern was that one of them could get—could be interested in pleading and—

"The Court: Your job is to evaluate this in the first thirty days of your representation.

"[Defense Counsel]: Yes, Your Honor. I was anticipating the possibility of some resolution at some point during the pretrial process but it doesn't appear that

that's going to be the case.

"The Court: Well, look, Francisco Navarro, you report tomorrow to Judge Kavanewsky to start jury selection on this case tomorrow, right, because *I assume your client is turning down the proposed disposition on this case*?

"[Defense Counsel]: *He does not want the ten suspended after five with three probation.*

"The Court: Okay. So, we're going to start trial tomorrow, Mr. Navarro." (Emphasis added.)

Immediately thereafter, the court called the defendant's case and engaged in the following colloquy with counsel:

"[Defense Counsel]: This is the case where I had intended to ask for a special public defender, Your Honor.

"The Court: And what's the basis for that?

"[Defense Counsel]: I think there is *some possibility of a conflict should* Francisco Navarro change his mind about entering a plea in this matter, Your Honor, and that would put me in a difficult situation, ethically.

"The Court: I'm not following. You need to give me more specific reasons than that.

"[Defense Counsel]: Well, the defense does appear to be in concert, Your Honor. Should Mr. Navarro change his mind about pleading—

"The Court: Which one, Mr. Francisco—

"[Defense Counsel]: Oh, Francisco. My apologies, Your Honor. The codefendant was just before Your Honor. *Should* he change his mind and during the allocution process, he *might* have to admit to facts which *could potentially* inculpate Jose Navarro.

"The Court: Right. *But Francisco is not admitting to anything. He's going to trial.*

"[Defense Counsel]: *That's correct, Your Honor.*

"The Court: And so, Jose is going to trial as well, right? *On their present record, both of these gentlemen,* which is their perfect right, *do not want to resolve the case and wish to go to trial. Is that true or not true*?

"[Defense Counsel]: *That's correct,* Your Honor.

"The Court: Okay. So, my concern is that it looks like these people were arrested on or about, you know, May 29, 2013. We're now May 29th—exactly one year ago, they were arrested. It's unreasonable to having this case been on the firm jury docket thirteen times, however many times on the pretrial docket, literally the day—twenty-four hours before their trial is supposed to start a lawyer represents these two defendants simultaneously for a full year, now, wants a new lawyer and

just on some speculation.[2] Okay, Jose Navarro's case is also put down for trial tomorrow morning, in front of Judge Kavanewsky." (Emphasis added; footnote added.)

We begin by setting forth the legal principles that govern our analysis. "It is well established that the sixth amendment to the United States constitution guarantees the right to effective assistance of counsel. . . . Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest. . . . This right requires that the assistance of counsel be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests." (Citations omitted; internal quotation marks omitted.) *State* v. *Vega*, 259 Conn. 374, 386, 788 A.2d 1221, cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002). To safeguard a criminal defendant's right to effective assistance of counsel, the United States Supreme Court in *Holloway* v. *Arkansas*, 435 U.S. 475, 485–86, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978) imposed "an affirmative obligation [on trial courts] to explore the possibility of conflict when such conflict is brought to the attention of the trial judge in a timely manner. . . . The course thereafter followed by the court in its inquiry depends upon the circumstances of the particular case." (Citations omitted; internal quotation marks omitted.) *State* v. *Vega*, supra, 389.

If "a trial court improperly requires joint representation over timely objection," then "reversal is automatic." *Holloway* v. *Arkansas*, supra, 435 U.S. 488. If, however, the court determines that the possibility of a conflict of interest is "too remote to warrant separate counsel," the court may deny counsel's request for separate counsel. Id., 484. This is because "[i]t is not representation of more than one client which deprives a defendant of his constitutional right to effective assistance of counsel, it is representation of *clients with adverse interests*." (Emphasis in original; internal quotation marks omitted.) *State* v. *Cator*, 256 Conn. 785, 794, 781 A.2d 285 (2001); see also *Cuyler* v. *Sullivan*, 446 U.S. 335, 348, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980) ("*Holloway* reaffirmed that multiple representation does not violate the Sixth Amendment unless it gives rise to a conflict of interest"); *Holloway* v. *Arkansas*, supra, 482 ("[r]equiring or permitting a single attorney to represent codefendants . . . is not *per se* violative of constitutional guarantees of effective assistance of counsel" [emphasis in original]).

Based on the particular circumstances in this case, we cannot conclude that the court violated the defendant's right to conflict free representation by not appointing a special public defender. When the defendant's case was called on May 29, 2014, the court asked counsel to articulate the basis for his request for a

special public defender for the defendant. Counsel indicated that "there is *some possibility of a conflict should* Francisco Navarro change his mind about entering a plea in this matter, Your Honor, and that would put me in a difficult situation, ethically." (Emphasis added.) Given the vague nature of counsel's representation, the court reasonably asked for a more specific reason for his request. Counsel, however, did not articulate why an *actual* conflict of interest existed or was likely to emerge. Instead, he repeated his supposition that "*should* [Francisco] change his mind and during the allocution process, he *might have to* admit to facts *which could potentially* inculpate [the defendant]." (Emphasis added.) When the court asked counsel whether Francisco wanted to resolve the case or go to trial, counsel, as he had during Francisco's pretrial hearing, represented that Francisco wanted to go to trial. On the basis of counsel's representation, the court reasonably concluded that the conflict of interest identified by counsel was speculative and too remote to require the appointment of separate counsel for the defendant. See *Mickens* v. *Taylor*, 535 U.S. 162, 171, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002) ("we think 'an actual conflict of interest' [means] precisely a conflict *that affected counsel's performance*—as opposed to a mere theoretical division of loyalties" [emphasis in original]).

The defendant nevertheless argues that "it is entirely plausible, and by no means remote, nonetheless 'too remote,' that Francisco, facing [twenty-five] years of incarceration, changed his mind and asked [counsel] to attempt to resolve the matter by plea bargain, even if it required inculpating [the defendant] and/or cooperating with the State. The moment Francisco conveyed such a desire to [counsel], [counsel] had a conflict of interest." (Emphasis omitted.) The fundamental flaw in the defendant's argument is that nothing in the record before this court indicates that Francisco told counsel that he wanted to plead guilty let alone that he was willing to cooperate with the state against his brother to secure a favorable plea deal. To the contrary, counsel represented to the court at both Francisco's and the defendant's hearing that Francisco wanted to go to trial. We decline to speculate as to what, if any, conversations counsel and Francisco had concerning his purported desire to reinitiate plea negotiations.

Finally, the defendant argues that the court improperly "steamroll[ed] defense counsel's request," "unduly focused on moving the docket," and concluded "that the request was untimely." We disagree. Although during Francisco's hearing the court expressed its consternation at the untimely nature of counsel's request for the appointment of a special public defender, the court clearly afforded counsel an opportunity to explain why substitute counsel was necessary. Counsel stated that there was a potential for a conflict of interest should

Francisco plead guilty, but he was unable to explain why this event was not too remote to require the appointment of separate counsel.

Therefore, we conclude that the court complied with its obligations under *Holloway* at the May 29, 2014 pretrial hearing.

## II

The defendant next claims that counsel rendered ineffective assistance at trial and sentencing because counsel was burdened by an actual conflict of interest that prevented him from emphasizing that he was less aggressive than Francisco was during the attempted burglary. The state responds that the defendant waived his right to conflict free representation and, alternatively, that the record is insufficient to review his claim on the merits. We agree with the state.

The following additional facts are relevant to this claim. On May 30, 2014, the parties met with the court, *Kavanewsky, J.*, in chambers to discuss the issue raised by counsel the day before. On June 2, 2014, the parties next appeared in court. The court engaged in the following colloquy with counsel:

"The Court: Okay. Now we have discussed this case before today and I know that before the case came here Judge Devlin was over at the [courthouse in geographical area number two] and had some discussion with counsel concerning this case. It's my understanding that counsel had continuously represented both defendants in this case.

"[Defense Counsel]: That is correct, Your Honor.

"The Court: Okay. And while there may have been some suggestion to Judge Devlin that a motion might be filed, because I want the record to be clear here, regarding the special public defender for one defendant. I don't know what was said on the record and what was not but when the case came to me and we had the same discussion, *counsel indicated that he had no intention whatsoever of filing such a motion and did not think it was warranted.* Do I have that—

"[Defense Counsel]: *That's correct, Your Honor.*

"The Court: Okay. And have your clients been kept abreast of all of this as we've gone along and as you've gone along?

"[Defense Counsel]: They have, Your Honor. And Your Honor in chambers on Friday [May 30, 2014] had indicated your intention to canvass them regarding the potential conflict. I did discuss that with them and prepared them for that canvass.

"The Court: Okay. And I am going to question them but before I do, is it your understanding that . . . both defendants waive any potential conflict and wish you to represent them in this matter?

"[Defense Counsel]: That is my under—

"The Court: Is that your understanding?

"[Defense Counsel]: That is my understanding, Your Honor.

"The Court: Okay. For the record, I previewed the evidence with the state and with defense counsel and, based on that preview, there was nothing that leapt out to me that in my mind would require the appointment of a special public defender for one of the two defendants. There did not seem to be any actual or potential conflict. However, I do want to canvass each defendant individually briefly concerning this matter and make sure we're on the same page so to speak."

The court then engaged in the following colloquy with the defendant:

"The Court: Okay. You've been here and listening to what I've been saying to your attorney.

"[The Defendant]: Yes, Your Honor.

"The Court: And have you understood what's been said so far?

"[The Defendant]: Yes, Your Honor.

"The Court: All right. Okay. This is the situation I want to satisfy myself that your attorney—you understand that there's always the possibility, although I am not seeing it here, but there's always a possibility that your attorney might have to prefer the interest of one defendant over the other. And let me give you some examples. Examples might be whether to accept or reject a plea bargain offered to one defendant condition[ed] on the defendants testifying against the other. That might be an example. *Whether or not to present a defense that helps one defendant more than the other, whether or not to cross-examine a witness whose testimony may help one defendant or hurt the other,* whether to have one defendant testify while the other remains silent.

"Of course, the right to testify is a right personal to each defendant, that's not a decision counsel gets to make but it's one that you would confer with him. Another [potential] conflict is *whether or not to emphasize in summation that certain evidence* is admitted only against, or *is less compelling against, one defendant than the other.* And *should it come down to a sentencing, whether or not to argue at sentencing that one defendant's role in the criminal activity was lesser or subordinate to that of the other defendant. Do you understand those are all situations* where your attorney—your attorney may be confronted with during the course of a trial?

"[The Defendant]: *I understand,* Your Honor.

"The Court: You understand that? Okay. And I want

to make sure that you understand that you have the right to effective representation, that you understand the details of your attorney's possible conflict of interest, any potential perils of a conflict and that you've discussed the matter with your attorney or that you have—or that you have a wish to discuss it with outside counsel. Do you understand all of that?

"[The Defendant]: I understand, Your Honor.

"The Court: Okay. And do you—you've discussed these matters, as I've gone over with you in a little lengthier form, but you've discussed them with your attorney?

"[The Defendant]: Yes, I have, Your Honor.

"The Court: Okay. What I'm going to do is this then, I'm going to question Francisco Navarro and then while the jury is being called down we'll bring the jury back, I'll take the bench and before we bring out the jury I'm going to ask you Mr. Navarro whether having heard what I've said and whether given the additional time to talk to your attorney about these matters, it's your wish to have counsel represent you. All right?

"[The Defendant]: Okay, Your Honor.

"The Court: Do you have any questions for me right now?

"[The Defendant]: I have no questions for you now." (Emphasis added.)

The court thereafter canvassed Francisco in the same manner and obtained the same assurance from Francisco that he was aware of the potential dangers of joint representation. The court then informed both defendants that they were going to take a brief recess, during which they could consult with counsel about the discussion they just had, and afterwards it would ask them individually whether they wanted to proceed with counsel as their attorney. After the recess, the court engaged in the following colloquy with the defendant:

"The Court:  .  .  .  You heard my questions before. Did you have an opportunity to further talk about this with your attorney during the recess?

"[The Defendant]: Yes, I have, Your Honor.

"The Court: Okay. Do you have any questions for your attorney?

"[The Defendant]: I have no questions.

"The Court: Do you have any questions for the court?

"[The Defendant]: No questions for the court.

"The Court: I need you to speak up for me, okay.

"[The Defendant]: No questions, Your Honor.

"The Court: All right. And do you waive any potential

for conflict free representation should that occur, yes or no?

"[The Defendant]: I didn't understand that question like that. I'm sorry.

"The Court: Okay. I went over certain situations before—

"[The Defendant]: Okay.

"The Court: —where I was addressing you and then I was addressing your brother. And I said there could be certain situations where *your attorney may have to make an election that could arguably favor one defendant more than the other.*

"[The Defendant]: *Okay.*

"The Court: Okay. *Or hurt more one defendant more than the other. Do you remember that?*

"[The Defendant]: *Yes, sir.* Yes, Your Honor.

"The Court: Okay. That is what I'm talking about examples of representation that would not be conflict free. Now, having heard all of that and having talked to your attorney, do you waive the potential for conflict for representation that may not be conflict free?

"[The Defendant]: Yes, I do.

"The Court: And do you wish [counsel] to represent you?

"[The Defendant]: Yes, I do. Your Honor.

"The Court: Okay. No questions at all about that?

"[The Defendant]: None at all." (Emphasis added.)

The court then engaged in a similar discussion with Francisco, who likewise assured the court that he had no questions about the court's canvass and that he would like to proceed with counsel representing him. After completing Francisco's canvass, the court directed the record to reflect "that both defendants were canvassed individually in open court concerning [counsel's] representing each defendant and each defendant has separately and knowingly and voluntarily and understandingly waived any potential for representation that may not be conflict free."

We conclude that the defendant knowingly and voluntarily waived his right to conflict free representation at trial and sentencing at the June 2, 2014 hearing.[3] "Just as the right to assistance of counsel may be waived in favor of self-representation . . . so may a defendant waive the right to conflict-free representation" so long as the trial court determines "on the record that such a waiver is knowing and intelligent." (Citations omitted.) *State* v. *Williams*, 203 Conn. 159, 167, 523 A.2d 1284 (1987). "If the defendant reveals that he is aware of and understands the various risks and pitfalls, and that he has the rational capacity to make a decision on the

basis of this information, and if he states clearly and unequivocally . . . that he nevertheless chooses to hazard [the] dangers of waiving conflict-free representation, then his waiver may appropriately be accepted. . . . The waiver is not vitiated simply because the defendant, with the benefit of hindsight, might have chosen differently. A defendant need not be prescient in order to waive knowingly and intelligently the right to conflict-free representation." (Citations omitted; internal quotation marks omitted.) Id., 167–68.

At the June 2, 2014 hearing, counsel represented that he had prepared his clients to be canvassed concerning their waiver of their right to conflict free representation. During its canvass, the court provided the defendant with examples of the types of conflicts that might arise during joint representation, including whether "to present a defense that helps one defendant more than the other," whether "to cross-examine a witness whose testimony may help one defendant or hurt the other," and, "should it come down to a sentencing, whether or not to argue at sentencing that one defendant's role in the criminal activity was lesser or subordinate to that of the other defendant." The defendant, after being given an opportunity to consult further with counsel and to ask the court questions concerning his rights and waiver, confirmed that he wanted to waive any potential conflict of interest that might arise from the joint representation and that he wanted counsel to continue to represent him.

The defendant now argues that this waiver was ineffective because the court (1) did not specifically advise him of his "right to separate counsel to avoid a conflict of interest resulting from such joint representation"; (2) improperly remarked that it did not believe, after previewing the state's evidence, that a conflict of interest existed; and (3) never told him that if he wanted to consult with "outside counsel," a term that "was too ambiguous and technical," "such 'outside counsel' would be provided at *no cost*." (Emphasis in original.) We disagree.

First, because the impetus for the canvass was counsel's request for a special public defender, it is reasonable to infer that the defendant understood that if a conflict of interest existed, new counsel would be appointed to represent him. Additionally, we are not persuaded that the court's frank assessment of the conflict situation prevented the defendant from understanding the risks associated with joint representation. The court acknowledged when speaking to the defendant that a conflict of interest could exist "although I'm not seeing it here." The court also conducted a thorough and informative canvass that explored a variety of conflicts that might arise before, during, and after a trial. The defendant never indicated that he did not understand the court's advisement or the import of his

waiver. For these same reasons, we cannot conclude that the court's failure to explain further the term "outside counsel" prevented the defendant from understanding the risks associated with joint representation. Accordingly, because the defendant waived his right to conflict free representation, he cannot claim that counsel rendered ineffective assistance by laboring under a conflict at trial or sentencing.

Nevertheless, even if we were to assume, arguendo, that the defendant did not waive his right to conflict free representation, his claim of ineffective assistance of counsel is unreviewable. "Almost without exception, we have required that a claim of ineffective assistance of counsel must be raised by way of habeas corpus, rather than by direct appeal, because of the need for a full evidentiary record for such [a] claim. . . . Moreover, we have stated as our preference that *all* of the claims of ineffective assistance, those arguably supported by the record as well as others requiring an evidentiary hearing, be evaluated by the same trier in the same proceeding. . . . On the rare occasions that we have addressed an ineffective assistance of counsel claim on direct appeal, we have limited our review to allegations that the defendant's sixth amendment rights had been jeopardized by the actions of the *trial court*, rather than by those of his counsel. . . . We have addressed such claims, moreover, only where the record of the trial court's allegedly improper action was adequate for review or the issue presented was a question of law, not one of fact requiring further evidentiary development. . . .

"In a case of a claimed [actual] conflict of interest . . . in order to establish a violation of the sixth amendment the defendant has a two-pronged task. He must establish (1) that counsel actively represented conflicting interests and (2) that an actual conflict of interest adversely affected his lawyer's performance. . . . We have described an attorney's conflict of interest as that which impedes his paramount duty of loyalty to his client. . . . Thus, an attorney may be considered to be laboring under an impaired duty of loyalty, and thereby be subject to conflicting interests, because of interests or factors personal to him that are inconsistent, diverse or otherwise discordant with [the interests] of his client . . . ." (Citations omitted; emphasis in original; footnotes omitted; internal quotation marks omitted.) *State v. Crespo*, 246 Conn. 665, 687–90, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999); see also *Cuyler* v. *Sullivan*, supra, 446 U.S. 350 ("the possibility of conflict is insufficient to impugn a criminal conviction").

Contrary to the defendant's assertion, we cannot conclude from the record before us that counsel's decision not to emphasize at trial and sentencing that Francisco was more aggressive than the defendant during the

attempted burglary was the product of an impaired duty of loyalty. See *State* v. *Crespo*, supra, 246 Conn. 690. The decision not to highlight Francisco's greater aggression during the burglary may have been a reasonable trial or sentencing strategy, properly discussed with and agreed to by the defendant. "Accordingly, we shall not review at this time . . . the defendant's ineffective assistance claim[s] that he contends [are] adequately supported by the record. . . . [W]e believe that his ineffective assistance claim[s] should be resolved . . . after an evidentiary hearing in the trial court where the attorney whose conduct is in question may have an opportunity to testify." (Internal quotation marks omitted.) *State* v. *Taft*, 306 Conn. 749, 769, 51 A.3d 988 (2012); see also *State* v. *Daly*, 111 Conn. App. 397, 400, 960 A.2d 1040 (2008) ("it is well established that as an appellate tribunal, we do not find facts"), cert. denied, 292 Conn. 909, 973 A.2d 108 (2009).

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant alternatively claims that the court violated his due process rights by failing to conduct a sufficient inquiry into the existence of a conflict of interest. The defendant, however, undertook no analysis or application of the law to the facts of the case. "We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited." (Citation omitted; internal quotation marks omitted.) *State* v. *Buhl*, 321 Conn. 688, 724, 138 A.3d 868 (2016). Accordingly, we decline to review the defendant's due process claim because it was briefed inadequately.

[2] The court misspoke when it indicated that jury selection commenced the next day, i.e., Friday, May 30, 2014. Instead, jury selection commenced the following Monday, i.e., Monday, June 2, 2014.

[3] The defendant also argues that "the attempted waiver did not apply retrospectively to plea negotiations." Because the defendant does not argue that his constitutional rights were violated by the existence of a conflict of interest during plea negotiations, we decline to consider this claim.